ZEIGLERS REFUSE COLLECTORS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 80–1538.

United States Court of Appeals,
Third Circuit.

Argued Dec. 2, 1980.

Decided Jan. 27, 1981.

A. Samuel Cook, Gary Z. Nothstein, Jeffrey P. Ayres (argued), Venable, Baetjer & Howard, Baltimore, Md., for petitioner.

W. Christian Schumann, Edward S. Dorsey (argued), N. L. R. B., Washington, D. C., for respondent.

Before ADAMS, GARTH and SLOVITER, Circuit Judges.

## OPINION OF THE COURT

GARTH, Circuit Judge.

In this case, certain employees who favored and backed a union, threatened their co-employees with physical violence if they did not vote for that union in the representation election. The Hearing Officer found this conduct created an atmosphere of fear and reprisal which warranted setting aside the election. The National Labor Relations Board summarily rejected the Hearing Officer's findings and concluded that the threats constituted no more than "mere campaign bravado." The Board refused to set aside the election and certified the union as the exclusive representative of the employees. Because we find the Board's decision unsupported by substantial evidence, we grant Zeigler's petition for review and we deny the Board's cross-petition for enforcement.

## I.

Zeiglers Refuse Collectors, Inc. ("Zeiglers") operates a refuse collecting business, including a Rear Load Division located in York, Pennsylvania. As of September 15, 1978, the date of the representation election, the Rear Load Division employed thirty eligible employee-voters.

The drive to unionize Zeigler's was initiated by employee Russell Knight. Sometime in the summer of 1978, he spoke with officials of Chauffeurs, Teamsters, and Helpers Local 430, Affiliated with the International Brotherhood of Teamsters; and subsequently began soliciting support for the union among his co-workers. On July 26, 1978, Local 430 filed a petition with the Board seeking a representation election among the rear load drivers of Zeiglers' York facility. The election was held September 15, 1978, and the union won by a vote of 16 to 14.

Zeiglers raised four objections to the election: employees with close ties to Local 430 had coerced fellow employees to vote for the union, and Local 430 had acquiesced in this activity; the atmosphere of coercion had prevented the holding of a free election; the union illegally had required certain employees to pay twenty dollars as a pre-condition to signing a union authorization card; and union officials illegally had interrogated and polled employees. The Regional Director recommended that a hearing be held only on the first two claims: union sponsorship of coercion and the claim that a coercive atmosphere prevented a free election. He found that the allegations concerning the illegal twenty dollar fee and the illegal interrogation were insufficient as a matter of law. The Board adopted the Regional Director's recommendations.

A hearing was held on February 21, 1979 before a Hearing Officer. Five employees of Zeiglers, two members of Zeiglers' management, and two officials of Local 430 testified. On April 9, 1979, the Hearing Officer issued his report recommending that, because of the coercive atmosphere which pervaded the September 15 election, a new election be held. This conclusion was based upon his finding that five incidents of coercive conduct took place. In approximate chronological order, these incidents are:

1. Employee Glenn Null testified that a few months prior to the election, Russ Knight, another employee, when handing out union authorization cards told a group of employees which included Glenn Null, Rick Chappell and Martin Morth-

land, that if they did not sign the cards, they would not work for the employer any longer.[1] Knight then requested a twenty dollar contribution from each of these workers. (App. at 289).

2. Russ Knight, Barry Leisenring and Larry Leisenring approached employee Martin Morthland about a week before the election, and informed him that employees who didn't give $20.00 and sign union authorization cards were going to "get their asses kicked." (App. at 108, 289).

3. About a week or two before the election, employee Charles "Pee Wee" Preston, a 6'7", 250 pound ex-Marine, approached Rick Chappell (5'8", 145 pounds) at the employee lunch wagon. Preston said to Chappell: "I heard you are voting no for the union" to which Chappell responded: "Whoever told you that is a liar." The Hearing Officer found that Chappell's response was motivated by his desire to avoid any trouble with Preston. Preston then warned: "Well you had better be voting for the Union if you know what is good for you." The Hearing Officer found that Chappell understood this statement to be a threat upon his physical well-being, and not a prediction of the benefits of unionization. (App. at 290).

4. A day before the election Preston walked over to employees Glenn Null (5'7", 140 pounds) and James Oleweiler and asked them if they were "going to vote no or yes for the Union." When neither responded, Preston threatened Null and Oleweiler that if they knew what was best for them, they would vote for the Union. (App. at 82, 290).

5. On election day, during the time the polls were open, Preston approached Null and Chappell at a spot forty feet from the polling place about five minutes before these two employees voted. According to Null, Preston stated: "What

are you voting, yes or no. If you vote no for the Union; me, Russ Knight and Barry Leisenring gets fired; we are going to kick your ass." Chappell remembered Preston saying: "When you go in there to vote, you had better vote for the Union or else you know what is going to happen." (App. at 290). The Hearing Officer found that Null and Chappell provided an accurate account of the incident.

The Hearing Officer held that these five threats created an atmosphere of fear which rendered the holding of a fair election impossible. He found this coercive atmosphere to be pervasive, because accounts of these threats were also circulated among the rank and file, and because reports had spread that Preston had threatened other employees as well.[2] He thus recommended that a new election be held, despite finding that none of the threats could be attributed to Local 430.

On appeal, the Board refused to accept the Hearing Officer's recommendation. Instead, in its decision of September 27, 1979, it certified Local 430 as the representative of the employees in the Zeiglers unit. The Board's analysis, in its entirety, is as follows:

> We do not accept the Hearing Officer's recommendation and find that, even assuming the correctness of the Hearing Officer's factual findings and credibility resolutions,[2] the Employer has not demonstrated a sufficient factual foundation for the setting aside of the election.
>
> [2] We do not accept the Hearing Officer's finding that Martin Morthland's recantation on cross-examination should not be credited. Morthland expressly denied that employees Knight and Barry and Larry Leisenring intimidated him with physical threats 1 week before the election. Furthermore, Morthland impeached his credibility by substantially wavering on the approximate date of the threatening encounter. The Hearing Officer speculates that Morthland recanted only in order to end his "ordeal" on the stand, but that is only

---

1. Chappell testified to the same effect as Null. In addition, Chappell claimed that another employee, Mo Leisenring, was also present when the statement was made. The Hearing Officer credited Null's and Chappell's testimony. (App. at 289)

2. Only inadmissible hearsay evidence was introduced to prove that these threats were actually uttered.

speculation and no basis for rehabilitaing [sic] Morthland.

The Hearing Officer finds "only minimal evidence concerning Petitioner's knowledge or participation in threats against employees concerning how they were going to vote." Furthermore, the most severe threats he attributes to pro-union employees are: If employees did not sign authorization cards, "they would not work for the Employer anymore"; "Whoever didn't give $20.00 and sign union authorization cards was going to 'get their asses kicked' "; "You had better be voting for the Union if you know what is good for you"; "If you vote no for the Union; me, Russ Knight and Barry Leisenring gets fired; we are going to kick your ass."

We do not agree with the Hearing Officer that the above gives rise "to a pervasive sense of apprehension among prospective voters." [3] Inasmuch as the Hearing Officer has found "minimal" evidence connecting these campaign incidents with the Petitioner in any way, and such incidents did not relate directly to the election vote or create a general atmosphere of fear and confusion, we find that there is no basis for setting aside the election.[4] We shall, therefore, overrule the Employer's Objections 1 and 2, and shall order that the Petitioner be certified.

[3] E. g., *Price Brothers Company*, 211 NLRB 822 (1974).

[4] The Hearing Officer incorrectly relies on *Sonoco of Puerto Rico, Inc.*, 210 NLRB 493 (1974), and *Diamond State Poultry Co., Inc.*, 107 NLRB 3 (1953), in support of his conclusion that the election ought to be set aside. In both those cases the election environment was pervaded by immediate and serious physical coercion. In the instant case, there was no violence—only generalized verbal threats which, unlike the Hearing Officer, we do not consider "numerous"—of the character familiar to the playgrounds as well as the shop. The alleged intimidators in this case engaged in mere campaign bravado and "heated statements" reflecting an "overzealous partisanship

rather than meaningful threats." *American Wholesalers, Inc.*, 218 NLRB 292 (1975).

In order to obtain judicial review of the Board's decision, Zeiglers refused to bargain with Local 430.[3] Local 430 filed an unfair labor charge, alleging Zeiglers had violated Section 8(a)(5) of the Act by refusing to bargain with a certified representative. In an order dated April 16, 1980, the Board entered summary judgment for Local 430. Zeiglers petitions for review of that order and the Board cross petitions for enforcement. Our review of this order also brings before us the underlying order of January 22, 1979 which affirmed the dismissal of the charge of an illegal collection of a $20 fee [4] and the Board's order of September 27, 1979, which reversed the Hearing Officer's recommendation to hold a new election.[5]

## II.

The purpose of holding representation elections is to provide a means whereby workers may fairly and freely choose their bargaining representative if indeed they want one. *See NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330, 67 S.Ct. 324, 327–328, 91 L.Ed. 322 (1946). A representation election should be "a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.*, 77 NLRB 124, 127 (1948) *quoted in Monmouth Medical Center v. NLRB*, 604 F.2d 820, 824 (3d Cir. 1979). The Board has an obligation to insure that an election is held "under such conditions as will be conducive to the sort of free and untrammeled choice of representatives contemplated by the Act." *Methodist Home v. NLRB*, 596 F.2d 1173, 1183 (4th Cir. 1979). *Cf. Marshall v. Local Union 12447, United Steelworkers of America*, 591 F.2d 199 (3d Cir. 1978) (In election of local union officials, Section 401(b) of the Labor-Management Reporting and Disclosure Act, 29 U.S.C. § 481(b) (1976) requires union to

---

**3.** *See, e. g., NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), *Aircraft Radio Corp. v. NLRB*, 519 F.2d 590, 591–92 n. 2 (3d Cir. 1975).

**4.** The claim of illegal polling is not raised on appeal.

**5.** *See* note 2 *supra.*

take every reasonable precaution to ensure voting secrecy).

■ We concede that the goal of "laboratory conditions" cannot always be satisfied. Not every election that fails to achieve perfection should be set aside, otherwise the employees' choice of a representative might never be accomplished, because a never-ending series of challenges to elections could be foreseen. Though we are reluctant to accept less-than-perfect conditions in the election process, we will do so, but only where no coercive conduct has poisoned the fair and free choice which employees are entitled to make. Hence, extreme care must be taken that the laboratory conditions have not become so tainted that employees may have based their vote not upon conviction, but upon fear or upon any other improperly induced consideration. The Board and the courts have emphasized that the existence of a coercive atmosphere, regardless of how such an atmosphere came about, is the critical fact upon which the Board should focus in determining whether a fair and free election was impossible. *Diamond State Poultry Co.*, 107 NLRB 3, 6 (1953); *Cross Baking Co. v. NLRB*, 453 F.2d 1346, 1348 (1st Cir. 1971). Thus, if it is determined that a substantial possibility existed that the threats affected the outcome of the election, a new election must be held.

■ In determining whether a fair and free choice by the employees was impossible the Board must consider many factors. These include: the number of the threats, the severity of the threats and whether those threatened were put in fear, the number of workers threatened, whether the threats were made close to the election

and whether they persisted in the minds of the employees at the time of the election, whether the reports of the threats were widely circulated, whether the effect of pro-union threats were cancelled out by pro-management threats, the closeness of the vote, *Monmouth Medical Center v. NLRB*, 604 F.2d 820, 823 n.4 (3d Cir. 1979), and whether the threats can be attributed to the union or the management, *see e. g., Price Bros. Co.*, 211 NLRB 822, 823 (1974). *See also Campbell Prods. Dept.*, 623 F.2d 876 (3d Cir. 1980). The Board must examine the record, determine the weight to be accorded each factor, and applying its experience, arrive at a final, articulated decision supported by substantial evidence.

## A.

Zeiglers and the Board are in strenuous disagreement over whether the coercive threats that were made here can be attributed to the union. Both the Hearing Officer and the Board concluded that they could not. We agree.

■ None of the workers who uttered the threats, including Pee Wee Preston and Russ Knight, held any position in or conferred by the union. *See NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir. 1976); *NLRB v. Urban Telephone Corp.*, 499 F.2d 239 (7th Cir. 1974). Nor does the record reveal any express impropriety committed by a union official. The only evidence that appears is that the president of Local 430, responded to Pee Wee's remark that he (Pee Wee) would physically intimidate those who were not in favor of unionization, by stating that such behavior was unacceptable.[6] There was no showing that

---

**6.** The relevant portion of the Hearing Officer's opinion dealing with this subject reads:

Based on the testimony of Rick Chappell, I find that Charles Preston in the presence of Petitioner's President, Kenneth Stocker, and Organizer, Bruce Keener, told the employees at the meeting that if the Petitioner needed more support to win the election, he would resort to physical intimidation to find out who was voting against the Petitioner. He then threatened to use force to change the votes of those employees who did not cur-

rently support the Petitioner. It is noteworthy that Chappell also credibly testified that Kenneth Stocker immediately told Preston "no, we don't want any of that stuff around here". Thus, the Petitioner made it clear that it did not approve of Preston's "organizing" techniques. There was no evidence to demonstrate that the Petitioner had reason to believe that Preston or any other employee would fail to abide by Stocker's admonishment of Preston.

the union knew of any improper acts or that it failed to repudiate them. *Certain-Teed Prods. Corp. v. NLRB*, 562 F.2d 500, 510 (7th Cir. 1977). Thus, even though Preston and Knight became by their own acts, self-appointed emissaries of the union, and even though we recognize a broad principal-agent standard under 29 U.S.C. § 152(13),[7] we conclude, as did the Hearing Officer and the Board, that the threats cannot be attributed to the union.

 However, we do not find the factor of union responsibility to be pivotal. It is merely one of many factors the Board must appraise in determining whether a fair and free election was impossible. Nor have other decisions accorded controlling weight to this factor. *Methodist Home v. NLRB*, 596 F.2d 1173, 1183 (4th Cir. 1979); *Sonoco of Puerto Rico, Inc.*, 410 NLRB 493, 494 (1974); *Steak House Meat Co.*, 206 NLRB 28, 29 (1973); *Diamond State Poultry Co.*, 107 NLRB 3, 6 (1953).[8] In *Methodist Home*, 596 F.2d at 1183, the Fourth Circuit wrote:

> If the conduct, though that of a mere Union adherent and not that of a Union agent or employee, is sufficiently substantial in nature to create a general environment of fear and reprisal such as to render a free choice of representation impossible, then it will require the voiding of the election. This was forcefully stated in *Home Town Foods v. N.L.R.B.* (5th Cir. 1967) 379 F.2d 241, 244, *reh. denied and reh. en banc denied* 416 F.2d 392 (1969):
>
> > "We are not impressed with the argument that all coercive acts must be shown to be attributable to the union itself, rather than to the rank and file of its

supporters. As the Board has once said, 'The important fact is that such conditions existed and that a free election is hereby rendered impossible.'"

Similarly the Board explained in *Diamond State Poultry*, 107 NLRB at 6:

> The issue before the Board is whether the election was conducted under such circumstances and under such conditions as were conducive to the sort of free and untrammeled choice of representatives contemplated by the Act. We hold that it was not. The election was held in such a general atmosphere of confusion and fear of reprisal as to render impossible the rational, uncoerced selection of a bargaining representative. It is not material that the fear and disorder may have been created by individual employees and non-employees and that their conduct cannot be attributed either to the Employer or to the unions. The important fact is that such conditions existed and that a free election was thereby rendered impossible.

(footnote omitted)

The Board asserts that its determination that the union did not participate in the threats must be given great weight because workers are less likely to be intimidated by threats that do not bear the imprimatur of the union, and that ordering a new election will not deter the improper conduct of third parties. *See NLRB v. Staub Cleaners, Inc.*, 418 F.2d 1086 (2d Cir. 1969); *Orleans Mfg. Co.*, 120 NLRB 630 (1958). Thus, in *Staub Cleaners, supra*, the Second Circuit found the union-third party distinction soundly based when applied to an anonymous rumor that had circulated among the employees. The court stated that prejudicial remarks

Chappell during the hearing testified, however, that President Stocker laughed after having told Preston "No we don't want any of that stuff around here." (App. at 151–52, 290–91).

7. "In determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." 29 U.S.C. § 152(13) (1976).

8. In *Methodist Home*, the Fourth Circuit remanded for an evidentiary hearing as to whether a purported joke involving the threatened use of a knife required that the election to be set aside. The Board in *Sonoco of Puerto Rico* and *Diamond State Poultry* set aside an election because of four threats of physical violence similar to those uttered during the election in question here. In *Steak House*, on several occasions one employee threatened a 16-year-old employee with bodily harm, and on one occasion threatened to kill him, if this employee voted against the union.

emanating from non-authoritative, anonymous sources are more lightly regarded than those backed by the union, and that setting aside the initial election would not deter these third parties from again acting improperly in a future election campaign.

We are more persuaded by former Chief Judge Aldrich's observations which appear in *Cross Baking Co. v. NLRB*, 453 F.2d 1346 (1st Cir. 1971). In that case two employees of the company assaulted two other employees of the company because the latter workers refused to support the union. Word of this incident was heard about the plant. Ultimately, it was held that the Board was justified in refusing to set aside the election on this evidence because the "principal actor" who committed the assault was thereafter almost immediately discharged. The incident was remote in time from the election, and no further incidents occurred in the months before the election. In discussing the fear engendered among employees by coercion of this kind, Chief Judge Aldrich wrote:

[1] We agree with the Board, but we do not agree with certain arguments it advanced in this court. Von Dreden [the employee chiefly responsible for the assault] was the principal in-plant union advocate. The Board regards it important that she was not shown to be a paid union agent. The question, however, is not the culpability of the union, but whether an atmosphere of fear and coercion was created in fact. *See Home Town Foods, Inc. v. NLRB*, 5 Cir., 1967, 379 F.2d 241, 244; *Shoreline Enterprises of America, Inc. v. NLRB*, 5 Cir., 1959, 262 F.2d 933, 942. It does not follow that fear would be less effective if it had an unofficial origin. Indeed, we can visualize situations where it might be more effective. If union officials instigated violence, anti-union employees might gain adherents to get rid, once and for all, of a belligerent union by voting against it, whereas if the atmosphere was the product of co-employees, the rest of the employees might feel they were going to be left with a disagreeable situation whatever should happen in the election, and hence had best learn to live with it. In any event, we agree with the earlier position of the Board that, regardless of whether coercive acts are shown to be attributable to the union itself, "[t]he important fact is that such conditions existed and that a free election was thereby rendered impossible." *Diamond State Poultry Co.*, 1953, 107 N.L.R.B. 3, 6.

*Id.* at 1348.

Here, the fact that Pee Wee Preston was not a union agent does not make his threats of physical violence any less intimidating. The sources of the threats and rumors at Zeiglers during this time were also well known. Yet, the union apparently did not keep a close watch on the election campaign; it sent no official into the workplace; and indeed the record does not disclose that the various union officials were aware that threats had been made, even though in at least one instance a union official was present when the use of threats was suggested. Although we cannot hold the union legally responsible for the coercive conduct, we question whether the union should not have taken a more active role in preventing the excesses of its supporters once it became aware that employee adherents were contemplating physical threats as a means of assuring a union victory.

### B.

Having found the union not responsible for the threats made by Preston and his colleagues, does not complete our task. The Board and the courts have acknowledged that even though the threats made were not attributable to the union, an election will nevertheless be set aside where the conduct created a general atmosphere inimical to the employees' exercise of a free and fair choice. The only distinction recognized in the statement of this standard is that less weight is accorded to conduct of third parties (such as Preston and Knight in the instant case) than to the conduct of the employer and the union. This standard has been expressed as follows:

It has long been established that, while conduct not attributable to either party to an election may be grounds for setting aside the election, less weight is accorded to such conduct than to the conduct of the parties. In such circumstances, however, the Board has set aside elections where the conduct created a general atmosphere among voting employees of confusion and fear of reprisal for failing to vote for or to support the Union. *Steak House Meat Co.*, 206 NLRB 3, 4 (1973) (footnotes omitted)

Thus, we still must determine under the stated standard whether substantial evidence supports the Board's findings and conclusions. The Board as we have noted rejected the Hearing Officer's findings of coercion and ruled that the election should be upheld.

■ In our substantial evidence review, we must address the Board's unexplained perfunctory rejection of the Hearing Officer's findings. *In Eastern Engineering & Elevator Co. v. NLRB*, 637 F.2d 191 at 197 (3d Cir. 1980) this court wrote:

In our review of the Board's order, the statute furnishes our basic direction: the reviewing court treats as conclusive the factual determinations in a Board decision if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f). That the responsibility of fact finding is placed on the Board and not on the hearing judge, however, does not end our inquiry. The Supreme Court has directed us to recognize that an ALJ's findings of fact constitute a vital part of the whole record that the court must review. These findings "are to be considered along with the consistency and inherent probability of testimony. The significance of his report . . . depends largely on the importance of credibility in the particular case." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 [71 S.Ct. 456, 468–469, 95 L.Ed.

456] (1951). We must "recognize that evidence supporting a conclusion may be less substantial when an impartial experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." *Id.*

Our review is particularly demanding when the Board has rejected the credibility determinations of the examiner that were based in large part on demeanor evidence. *See Eastern Engineering, supra,* at 197–198. Judge Wallace of the Ninth Circuit wrote in *Penasquitos Village Inc. v. NLRB*, 565 F.2d 1074 (9th Cir. 1977) (Wallace, J. opinion announcing the judgment of the court), an opinion discussed with approval in *Eastern Engineering,* at 197–198, that evidence in the record that alone might amount to substantial evidence and therefore support the Board's decision, may be insufficient when the trial examiner, on the basis of the witnesses' demeanor, made credibility determinations contrary to the Board's position.

The Hearing Officer here was in the best position to determine the atmosphere of the workplace during the election campaign. He could observe whether the workers who were threatened appeared to have been scared, and whether, in light of their mental state and physical stature, they were likely to have been influenced by the threats. The Hearing Officer could also make the "front line" determination as to whether the threats were in fact intimidating, and even more so, whether the persons making the threats were themselves frightening. The Board in reviewing a cold record was in a less knowledgeable position to decide these issues, particularly where the inquiry focused on subjective fears and subjective reactions.[9]

The Hearing Officer in this case found that there had been at least five separate incidents of coercion. In recommending a new election he expressly considered the

9. Placing a greater burden on the Board when it rejects the findings of the trial examiner also serves institutional values. A Hearing Officer who has his well-reasoned factual findings overridden by the Board in a brief conclusory manner, as the Board did in this case, may in the future, be inclined to write less thorough and detailed opinions.

following facts: numerous employees had been threatened, the threats were serious, involving physical violence and loss of jobs; that these threats, particularly those made by Pee Wee Preston, created fear in the minds of those threatened; that reports of the threats were widely circulated, and that rumors of other incidents of physical coercion had swept Zeiglers. Implicit in his discussion of these facts is that he deemed it significant that four of the five incidents occurred within a week or two of the election, and that the two most egregious threats took place respectively on the day before the election, and on the day of the election. He concluded after analyzing all these circumstances that a fair and free election had been made impossible.

These findings made by the Hearing Officer are amply supported in the record. Even the Board concedes that four out of the five incidents of coercion occurred. A reading of the transcript reveals that Null and Chappell were scared by the threats; and that they sincerely believed that they would be beaten up by Pee Wee if the union lost the election.

Chappell testified that he considered Pee Wee's statement that he, Chappell, had better vote for the union if he knew what was good for him, to be a threat that Pee Wee would beat him up. (App. at 124, 136). This threat scared him and caused him to fear Preston. (App. at 139). When asked to explain, he appropriately remarked, "Well if you have a guy standing over you that is a couple feet taller than you and bigger than you, I think you would be a little scared, too." (App. at 139–40).

Chappell also described Preston's statement on election day, as being a threat (App. at 124). He testified that he was only half-scared by this threat because Mo Leisenring, who had two baseball bats in the back of the truck, would help protect him, as would Null.

Null also interpreted this election day threat literally: if the union lost, and Knight and Preston were fired, Knight and Preston would "kick his ass." (App. at 86, 88). Null claimed that he was "not really" afraid, because Mo Leisenring was present, but qualified this statement by adding "unless I was by my own self see, I didn't know if he was going to get other friends or not. See, like people does like that [sic]. They try to get their other friends and stuff...." (App. at 87).

Null also considered Preston's statement made to Oleweiler and to him the day before the election, to be a threat. Again he claimed that he was "not really afraid", though he quickly added, "[y]ou know, he might beat me up, but—" (App. at 84). In general, Null testified that he really thought he would be physically harmed by Preston if he voted against the union. (App. at 105). He indicated on re-cross examination that his testimony that he had not been really afraid when threatened could not be taken too literally:

Q. You did testify that you were not afraid of Mr. Preston. Isn't that true?

A. Kind of, I'm kind of afraid of him, you know, like I said, he could beat me. I don't know.

Q. But, you were not afraid of him. You would fight him.

A. I wouldn't fight him. I would get all my brothers. He is a little too big for me.

(App. at 106).[10]

The record also reveals that Null and Chappell were small in stature, unsophisticated,[11] and thus likely to be influenced by Pee Wee and his coercive warnings. Finally, the election was close—a switch of one

10. Thus the Board engages in sophistry when it states in its brief that the threat "Well, you had better be voting for the union if you know what is good for you" is "susceptible of the interpretation that union representation would be good for the employees because it would better their wages and working conditions." (NLRB brief at 20). This interpretation not only fails to recognize the significance of demeanor evidence, but more importantly, it is belied by the reactions of those threatened.

11. Null was only 17 years old at the time of the election (App. at 72); Chappell's age is not revealed by the record, though he also appears to have been young.

vote would have altered the outcome. This record gives us good cause to believe that the coercive conduct which the Hearing Officer found gave rise to a substantial likelihood that the outcome of the election was affected. *See NLRB v. Staub Cleaners, Inc., supra,* 418 F.2d at 1088.

In its decision, the Board claimed that it assumed "the correctness of the Hearing Officer's factual findings and credibility resolutions." [12] The Board did not accept, however, the examiner's factual findings that a general atmosphere of fear and confusion existed. It overruled this conclusion of the Hearing Officer because it concluded that the threats were not attributable to the union and because there were "only generalized verbal threats . . . of the character familiar to the playground as well as the shop . . . [the threats were] mere campaign bravado and 'heated statements' reflecting an 'overzealous partisanship rather than meaningful threats.'" The Board also remarked that it did not consider the threats numerous and that they did not relate directly to the election vote.

It is true that the Board is said to be possessed of expertise in many aspects of the labor field. But that expertise cannot suffice as a substitute for evidence. In the complete absence of any evidence that threats made by a 6'7", 250 pound union adherent to co-workers of substantially slighter dimensions were "mere campaign bravado", we are not inclined to accept the Board's speculative characterizations. Indeed, under our standard of review, we are precluded from so doing.

This record is completely devoid of any evidence which could lead to a conclusion that Pee Wee Preston did not intend to carry out his threats as he had expressed them. "When fear and threats of violence are present, the employees' state of mind is precisely the question at issue." *Cross Baking, supra,* at 1348. In this case the Hearing Officer, who saw both the threatened employees and those accused of threatening, found that Chappell and Null understood Preston's warnings to be threats upon their physical well-being. In finding that the statements made by Knight and Preston created an atmosphere of fear and that accounts of these threats circulated freely among Zeiglers' employees, the Hearing Officer also found that these threats did not have an isolated impact but gave rise to a pervasive sense of apprehension among prospective voters. Yet, at no time has the Board addressed these findings.

Nowhere in the testimony or in the Hearing Officer's opinion is there even a suggestion that Preston's statements "We are going to kick your ass" and "You had better be voting for the union if you know what is good for you" were deemed to be jokes, mere bravado, or an outpouring of overzealous partisanship. *See Methodist Home v. NLRB, supra; NLRB v. Bostik Div. USM Corp.,* 517 F.2d 971 (6th Cir. 1975).[13] To the

---

12. In its footnote 3 the Board refused to accept the Hearing Officer's finding that Morthland had been threatened because he had recanted, and because he wavered substantially as to the date of the encounter. It appears to us that the Hearing Officer was better able than the Board to judge whether Morthland's recantation was sincere. Looking at the cold record it is difficult to determine why Morthland changed his testimony. We have more confidence in the Hearing Officer who observed Morthland on the stand and in the Hearing Officer's evaluation, than we have in the Board's assessment which suffers from its failure to be present during the hearing. Although Morthland was inconsistent, there is little indication that he was fabricating the account of his threats. Morthland's testimony is not key to our resolution; even if we accept his discrediting by the Board, our decision would remain the same.

13. In *Bostik,* there was evidence in the record "that the 'threats' were not considered or intended seriously and had no inhibiting effect on the voters." *Id.* at 973. There was evidence that two of the employees involved in several of the incidents always kidded and joked with each other "and that the employee to whom the abusive language was directed 'kind of laughed.'" *Id.* The Hearing Officer there concluded that this interplay had not created an atmosphere of fear of coercion. In contradistinction to *Bostik,* here there is no evidence that the threats were made in jest (Neither Null nor Chappell was a friend of Preston) and the Hearing Officer here found that these threats had created an atmosphere of fear and coercion.

contrary, the evidence and the findings are unequivocal: these were meaningful threats, having the obvious aim of coercing employees to vote for the union or otherwise suffer physical harm. *Sonoco of Puerto Rico, Inc.*, 210 NLRB 493, 494 (1974).

For reasons that we have previously discussed, we also do not attach the same significance as the Board to the fact that these threats are not attributable to the union. Nor do we accept the Board's conclusion that five documented incidents are not numerous when there are only thirty employees. Finally, we are at a loss to understand the Board's statement that the threats, such as "If you vote no for the union; ... we are going to kick your ass," did not directly relate to the election vote. At least three of the five threats could not have been more specifically aimed at influencing the election.[14]

Our independent review of the record has fully satisfied us that there is no evidence whatsoever which supports the Board's decision. On the other hand, we find more than ample evidence to support the findings of the Hearing Officer. In this respect we have accorded the Hearing Officer's determination which was based on a first-hand impression of the witnesses' demeanor, the weight to which it is entitled. *See Eastern Engineering, supra.* We find it difficult to understand how, in the context of this record, the Board could find that this election should be sustained. We are of the opinion that "the character of the conduct was so aggravated as to create an atmosphere of fear and reprisal which rendered a free expression of choice of representation impossible, and thus destroyed the laboratory conditions of the election." *Sonoco of Puerto Rico, Inc., supra* at 494.[15]

### III.

Having concluded that *no evidence* supports the Board's order we will grant Zeiglers' petition for review, order the September 15, 1978 election to be set aside, and deny the Board's cross petition for enforcement.

---

14. The Board also failed to take into account the closeness of the vote, that four of the threats were made within a week or two of the election, and that reports of these and other threats, circulated among the workforce.

15. The company, relying on *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), has also claimed that the union's requirement that the employees pay a non-refundable $20 fee before being allowed to sign a union authorization card interfered with employee free choice. Both the Regional Director and the Board found such a requirement would not justify setting an election aside. We have grave doubts that *Savair* would prohibit the practice in question here. However, in light of our disposition, which sets aside the election because an atmosphere of fear and reprisal made a fair and free election impossible, we do not reach or decide this issue.