**MOLDED ACOUSTICAL PRODUCTS, INC., Petitioner in No. 86–3468, Respondent in No. 86–3561,**

**v.**

**NATIONAL LABOR RELATIONS BOARD and Local 773, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Intervenor.**

Nos. 86–3468, 86–3561.

United States Court of Appeals, Third Circuit.

Argued March 3, 1987.

Decided April 8, 1987.

Rehearing and Rehearing In Banc Denied May 4, 1987.

Edward H. Feege (argued), Thomas L. Heimbach, Duane, Morris & Heckscher, Allentown, Pa., for Molded Acoustical Products, Inc.

Paul J. Spielberg, Deputy Asst. Gen. Counsel, Mark S. McCarty (argued), Atty., N.L.R.B., Washington, D.C., Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, for N.L.R.B.

Stephen C. Richman, William T. Josem (argued), Markowitz & Richman, Philadelphia, Pa., for intervenor.

Before GIBBONS, Chief Judge, and SEITZ and GARTH, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

The National Labor Relations Board (the Board) petitions for enforcement of its order holding that the refusal of the petitioner, Molded Acoustical, Inc. (the Company), to bargain with the respondent, Local 773, International Brotherhood of Teamsters, Chauffers, Warehousemen and Helpers of America (the Union), violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (5) (1982). In challenging the Board's order, the Company contends: 1) that the election which led to the Union's certification was tainted by a Union promise to waive all initiation fees if the Company's employees elected the Union as their bargaining representative; 2) that the Board improperly refused to conduct an evidentiary hearing to determine the effect that the Union's waiver had on eligible voters; and 3) that the relocation of Company operations subsequent to the election in question constituted changed circumstances sufficient to obviate any obligation to bargain with the Union. Because we find no merit in these contentions, we will enforce the Board's order in its entirety.

## I.

On October 26, 1983, the Union filed a petition with the Board, pursuant to section 9 of the NLRA, 29 U.S.C. § 159 (1982), seeking to represent certain employees of the Company. The Company and the Union entered into an election agreement on November 14, 1983, which was approved by the Regional Director of the Board on the next day. The Company and the Union further agreed that the election would be held in the following bargaining unit:

All full-time and regular part-time production and maintenance employees at the [Company's] Main Street facility, but excluding all other employees, including office and plant clerical employees, professional employees, lead men, confidential employees, guards and supervisors, as defined in the [NLRA].

The election was eventually held on December 30, 1983. At the election, 60 votes were cast in favor of and 55 against union representation.

Eleven days before the election, the Union sent a letter to the employees in the proposed bargaining unit. In that letter,

the Union urged these employees to vote for Union representation. In addition, in a postscript, the Union stated:

> All employees in the bargaining unit will not have to pay the $50.00 Initiation Fee if they vote for the Teamsters to represent them. Also dues will not be payable until there is a signed contract!

After the election, the Company filed objections to it on the ground that the quoted postscript violated the United States Supreme Court's decision in *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973). Specifically, the Company contended that this postscript presented an improper inducement for employees to vote for union representation and that it effectively undercut their free choice. The Regional Director, however, rejected the Company's objections. While recognizing that *Savair* prohibits a union from limiting an offer to waive initiation fees solely to those employees who sign union authorization cards before a certification election, the Regional Director opined that this offer to waive fees was clearly not so limited. Accordingly, the Regional Director upheld the validity of the election.

The Company filed exceptions to the Regional Director's report and requested that the Board either order a new election or hold a hearing for the purpose of taking testimony to resolve disputed factual issues. On December 10, 1984, the Board issued a "Decision and Certification of Representative" adopting the Regional Director's findings and recommendations. In that decision, the Board stated that the Company's interpretation of the challenged postscript—i.e., that only those employees that voted for the Union would qualify for the waiver of initiation fees—was "unreasonable in light of the Board's fully publicized secret-ballot procedure." *Molded Acoustical Products, Inc.*, 273 NLRB 156, 156 n. 1 (1984).

After the Board certified the Union, the Company refused to bargain. The Company based its refusal to bargain in part on the movement of its operations from Easton, Pennsylvania to Palmer Township, Pennsylvania—a distance of seven miles. The Company contended that this move led to employee turnover and substantial changes in operations which required reexamination of the Union's status as the employees' legitimate bargaining representative.[1] Although it was first proposed before the Union election of 1983, the Company's movement of operations was completed after the Union had been certified.[2] The Company also based its refusal to bargain on the contention that the Board had improperly declined to order a new election in spite of the Company's previous objections.

On May 6, 1985, a hearing concerning the Company's refusal to bargain with the Union was held before an Administrative Law Judge. The Administrative Law Judge held that the Company's refusal to bargain

---

**1.** The extant facts seem to contradict the contention that the Company's old and new plants are dissimilar operations. At both the Easton and the Palmer Township facilities, the Company manufactured fiberglass products for thermal and acoustical applications. Although the specific items produced by the Company are constantly changing, this is only because the needs of the Company's customers are constantly changing. It is significant that the Company did not lose any customers because of the movement of the plant. Furthermore, it is apparent that the work conditions and work force at the Palmer Township plant are essentially the same as those at the Easton facility. The new plant began operations with 37 production and maintenance employees. All 37 of these employees came over from the Company's old facility. By May of 1985 there were 118 production employees at the new plant, at least 100 of which had transferred from the old facility. Those employees continued to perform the same work they had previously performed at the old plant, except that the new facility was a more modernized operation. The wages and benefits of the employees remained unchanged after the move and the labor market from which the employees were drawn remains essentially the same. The working conditions, break areas, and shifts of the employees at the new plant are also the same as they were shortly prior to the closing of the old facility. In addition, the hiring policy and disciplinary procedures were not changed after the move. Finally, the Company's employee manual was applied at both facilities and the manual was not substantially modified prior to or after the move to Palmer Township.

**2.** The Company began to move its operations to Palmer Township on October 8, 1984, and the move was completed on March 10, 1985.

violated sections 8(a)(1) and 8(a)(5) of the NLRA, 29 U.S.C. §§ 158(a)(1), 158(a)(5). In so deciding, the Administrative Law Judge determined that the basic operation at the Company's old and new plants remained unchanged and that no unusual circumstances justified its refusal to bargain. Furthermore, he declined to consider the waiver of initiation fee issue inasmuch as that issue had previously been determined in the representation proceedings.

On July 31, 1986, the Board issued a decision adopting the recommended order of the Administrative Law Judge in all respects. The Company's petition to review and the Board's cross-application for enforcement were then filed with this court.

## II.

The primary issue to be determined is whether the Union's pre-election letter, promising to waive initiation fees if employees opted for Union representation, is an inducement to vote for the Union which violated NLRA sections 8(a)(1) and 8(a)(5), 29 U.S.C. §§ 158(a)(1), 158(a)(5). The Board determined that this promise by the Union did not so taint the first election as to warrant a second vote. As the reviewing court, we will only reverse the Board's holding if it is not supported by substantial evidence on the record. *Black Grievance Committee v. NLRB*, 749 F.2d 1072, 1074 (3d Cir.1984), *cert. denied*, 472 U.S. 1008, 105 S.Ct. 2703–04, 86 L.Ed.2d 719 (1985); *NLRB v. L. & J. Equipment Company, Inc.*, 745 F.2d 224, 231 (3d Cir.1984); *Medical Center of Beaver County, Inc. v. NLRB*, 716 F.2d 995, 997 (3d Cir.1983). More specifically, we must respect the Board's decision in this matter unless "the manner in which the election was held raises a reasonable doubt as to its validity." *NLRB v. ARA Services, Inc.*, 717 F.2d 57, 68 (3d Cir.1983) (en banc) (citing *Polymers, Inc.*, 174 NLRB 282, 283 (1969)).

In *Savair*, 414 U.S. 270, 94 S.Ct. 495 (1973), the Supreme Court concluded that a union's offer to waive initiation fees only for those employees who signed union recognition slips prior to a representation election was improper. The Court so decided because such an offer is likely to interfere with employee free choice in two ways. First, by enabling the union to "buy endorsements" from employees, this offer would permit the union to "paint a false portrait of employee support during its election campaign." *Id.* at 277, 94 S.Ct. at 499. Second, although the submission of a union recognition slip does not bind an employee to vote for the union, at least some employees who had improperly been persuaded to sign the slips might feel obligated "to carry through on their stated intention to support the union." *Id.* at 277–78, 94 S.Ct. at 499. The *Savair* majority did indicate, however, that a union has a legitimate interest in waiving its new member initiation fee, and that it may do so as long as the waiver applies "not only to those who have signed up with the union before an election but also to those who join after the election." *Id.* at 274 n. 4, 94 S.Ct. at 497 n. 4.

Following the *Savair* guidelines, courts have consistently ruled that a union does not endanger employees' freedom of choice if, prior to the representation election, the union promises to waive initiation fees for all employees in the bargaining unit regardless of whether the employees signed union recognition slips prior to election. *See, e.g., NLRB v. First Union Management, Inc.*, 777 F.2d 330, 335 (6th Cir.1985); *Bokum Resources Corp. v. NLRB*, 655 F.2d 1021, 1024 (10th Cir.1981); *Vicksburg Hospital, Inc. v. NLRB*, 653 F.2d 1070, 1076 (5th Cir.1981); *NLRB v. Whitney Museum of American Art*, 636 F.2d 19, 21 (2d Cir.1980); *NLRB v. Target Stores, Inc.*, 547 F.2d 421, 424 (8th Cir.1977). In all of these cases, the key to the validity of the union's promise to waive initiation fees was that it was made to all employees without concern for whether they supported the union during any phase of the elective process.

As previously mentioned, the Company challenges the validity of the Union's pre-election letter which stated that "[a]ll employees in the bargaining unit will not have to pay the ... $50.00 Initiation Fee if they vote for the [union] to represent

them." Although the Regional Director admitted that this language is somewhat imprecise, he opined that "it is sufficiently clear that the statement means that the union would waive payment of its initiation fee for all bargaining unit employees, without distinction, if the Union won the Board election and became their collective bargaining representative." The Company contends, however, that this language permits a second distinct and equally plausible interpretation. While apparently conceding that a reasonable reader might assign the same meaning to this language as the Regional Director did, the Company posits that an equally reasonable reader might conclude that this language affords the waiver of initiation fees only to employees who vote for the Union. Indeed, the Union's desire for an across-the-board waiver of initiation fees would have been more evident had its letter stated that "no employees in the bargaining unit will have to pay the $50.00 initiation fee if the Teamsters are elected to represent them." The Company insists that, because the Union's promised waiver contains this potential ambiguity, the ambiguity should be construed against the Union, *see Coleman Company, Inc.,* 212 NLRB 927, 927–28 (1974),[3] and should be viewed as improperly and irreparably tainting the initial representation election.

The Company's contention cannot be accepted. Because the ballots in a union election are kept secret even after the vote is tallied, the Union will never be able to determine which employees actually voted for union representation.[4] Although it is

---

**3.** In *Coleman Company,* the Board discussed its policy that, when considering the validity of union representation elections, all ambiguities in union literature shall be construed against the union. There, the union made a pre-election promise that initiation fees would be waived "for all present employees who make application for charter membership in [the] new local union." In holding that this language improperly interfered with the election, the Board stated:

> In the instant case, the promise of benefit is extended in terms which lack a critical detail. For nowhere in the letter does it appear when the employees to whom it was sent must make their "application for charter membership" in order to be eligible for the waiver.... We think that the requirement in the case before us of an *application* for charter membership is at the least equally ambiguous and just as susceptible of an interpretation by the employees that it is to their benefit to make a union commitment before the election, and thereby "come in at the ground floor," to avoid paying the initiation fee. If the letter was not intended to be thus read, it was Petitioner's duty, as explained in Inland Shoe Manufacturing Co., Inc., [211 NLRB 724 (1974)] "to clarify that ambiguity or suffer whatever consequences might attach to employees' possible interpretations of the ambiguity."

212 NLRB at 927–28.

The Company notes that this court has stated that "[the Board] is bound to adhere to the policy it announces, until such time as the policy is modified or abandoned." *NLRB v. Campbell Products Dept.,* 623 F.2d 876, 881 (3d Cir. 1980) (citations omitted). Accordingly, the Company contends that the Board erred because, contrary to its own policy, it failed to construe the instant ambiguity against the Union.

We reject the Company's analysis for two reasons. First, we note that, with regard to the waiver of initiation fees, the union in *Coleman* required employees to take pro-union action prior to the election, while the Union in the instant case did not. Second, we simply do not believe that the language of the pre-election letter in *Coleman*—with its references to "charter membership"—is as clear as the letter given to the employees in this case. Indeed, for reasons that will be discussed *infra,* the only plausible interpretation that can be given to the letter now in question is the one afforded by the Regional Director. Hence, the policy announced in *Coleman* does not compel us to decide this case in the Company's favor.

**4.** The Company contends that the Board's holding in Deming Division, Crane Company, 225 NLRB 657 (1976), requires that we reverse the Board's determination in this case. In *Deming,* the union made a pre-election announcement to employees in the proposed bargaining unit that "[t]here will be no initiation fee for anyone joining now during this campaign." *Id.* at 659. In deciding that this language constituted an impermissible interference with the election process, the Board stated:

> [A] waiver [of fees] is permissible only where it is unconnected with support for the union before the election, unrelated to a vote in the election, and with support for the union before the election, unrelated to a vote in the election, and without distinction between joining the union before or after the election.
*Id.*

The situation presented in *Deming* clearly differs from the instant situation. In that case, the union's pre-election announcement explicitly

true that a company can challenge specific ballots cast in an election, thereby ascertaining how those employees voted, such challenges are strictly limited and may not be indiscriminate. *See NLRB v. A.J. Tower Co.*, 329 U.S. 324, 331–32, 67 S.Ct. 324, 328, 91 L.Ed. 322 (1946).[5] Clearly, the Company would not be permitted to challenge all of the ballots in an election for the purpose of identifying all of the employees who voted for union representation. This being so, it would be highly illogical to assign the meaning to the Union's pre-election letter that the Company now urges. Certainly, the Union, being fully aware that it could never ascertain all of the employees who voted for it in the election, would not propose to deny certain employees the promised fee waiver because they did not vote for Union representation. Hence, the only plausible interpretation of the Union's pre-election offer to waive initiation fees is that it was intended to apply to all employees in the bargaining unit. That being the case, this waiver did not so flaw the original election as to warrant a new election under *Savair*.

We are similarly unimpressed with the argument that, although the Union's proposed fee waiver must logically apply to all employees in the bargaining unit, the fact that employees might misinterpret the scope of this waiver is *per se* enough to invalidate this election. The contention is that employees, faced with a perceived, albeit nonexistent, possibility that they may forfeit the fee waiver if they do not vote for the Union, may improperly feel compelled to vote for Union representation. We reject this argument for two reasons. First, we believe that such an argument greatly exaggerates the extent to which unions and employers must maintain "labo-

ratory conditions" prior to a representation election. Indeed, as previously pointed out *Savair* expressly recognized that pre-election promises by a union to waive initiation fees do not impermissibly affect a union election as long as the waiver is extended to all employees in the bargaining unit. 414 U.S. at 274 n. 4, 94 S.Ct. at 497 n. 4. Second, we do not choose to ascribe the level of ignorance to employees that acceptance of this argument would necessarily require. No reasonable employee would view a vote for Union representation in a secret ballot election as the *quid pro quo* for a waiver of initiation fees. Therefore, we hold that the Union's fee waiver did not impermissibly undercut employee free choice concerning Union representation.

There being substantial evidence on the record to support the Board's decision that the Union's pre-election fee waiver was proper, we proceed to the Company's other claims.

### III.

The Company contends that the Board should have conducted a hearing to investigate the effect that the Union's fee waiver offer had on eligible voters. As we held in *ARA Services*, 717 F.2d at 67, the refusal to conduct a hearing regarding election challenges shall only be reversed if such refusal constitutes an abuse of discretion. Based upon our examination of the record, we find no such abuse here.

It is well-settled that the impact of a pre-election inducement such as the Union's fee waiver offer is to be determined by an objective analysis of its words and their context. *See NLRB v. Clearfield Cheese Co.*, 322 F.2d 89, 93–94 (3d Cir.1963). Cer-

---

conditioned the waiver of initiation fees on an employee's showing of union support *during an election campaign*—a clear violation of *Savair*, 414 U.S. at 277–78, 94 S.Ct. at 499. The proposed fee waiver in the instant case does not require pro-union activity on the part of employees prior to the representation election; hence, this waiver is permissible under *Savair* and related cases.

5. The Company challenged the ballots of eight employees in the initial election: four on the

ground that they were cast by people no longer employed by the Company and not likely to be recalled; two because they were cast by people whose names were not on the voter eligibility list; and two on the ground that they were cast by employees who are supervisors within the meaning of the NLRA. It is evident that these challenges had nothing to do with the effect of the Union's offer to waive initiation fees on the election.

tainly, based on the available objective evidence, the Board's instant determination—that the Union's fee waiver did not improperly affect the unit employees' choice regarding a bargaining representative—was not unreasonable. Indeed, as previously noted, given the fact representation elections are secret, no reasonable employee would vote for the Union out of fear of being denied the initiation fee waiver. Nevertheless, the Company urges that we cannot ascertain the true effect of the Union's fee waiver offer without eliciting the actual reactions of employees in the bargaining unit. This court and other courts have regularly refused, however, to order evidentiary hearings to permit unit employees to testify concerning their subjective reactions to conduct that allegedly impaired a fair election. *See, e.g., Harlan No. 4 Coal Co. v. NLRB*, 490 F.2d 117, 122–23 (6th Cir.), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974); *Ex-Cell-O Corp. v. NLRB*, 449 F.2d 1058, 1063 (D.C.Cir.1971); *Clearfield Cheese*, 332 F.2d at 93–94. Any such inquiry regarding an employee's subjective understanding of campaign statements leads inevitably to questions about how that understanding affected his vote. As this court has observed in analogous situations, such questions are "destructive of the purpose of the secret ballot and creative of the specter of post-election change of mind." *Clearfield Cheese*, 322 F.2d at 94; *see also NLRB v. Gissel Packing Co.*, 395 U.S. 575, 608, 89 S.Ct. 1918, 1937, 23 L.Ed.2d 547 (1969) (probing an employee's subjective motivation for signing a union authorization card "involv[es] an endless and unreliable inquiry"). Accordingly, we conclude that the Board properly considered all appropriate evidence in deciding that no hearing was required in this instance.

### IV.

■ The Company finally asserts that the transfer of its operations from Easton to Palmer Township constitutes changed circumstances which cast into doubt the Union's ongoing status as bargaining representative for the unit employees. The Board held that the Company's operations remained substantially unchanged as a result of its relocation. Therefore, the Board concluded that the Union's status as bargaining representative survived the Company's move to Palmer Township. As the reviewing court, we will uphold the Board's determination if it is supported by substantial evidence on the record. *Black Grievance Committee*, 749 F.2d at 1074; *L. & J. Equipment*, 745 F.2d at 231; *Beaver County*, 716 F.2d at 997.

In *Brooks v. NLRB*, 348 U.S. 96, 102–04, 75 S.Ct. 176, 180–81, 99 L.Ed. 125 (1954), the United States Supreme Court held that, for one year after the date of a Board certification, a certified bargaining representative enjoys a presumption of continuing support from a majority of the employees in the bargaining unit. *See also NLRB v. Paper Manufacturers Co.*, 786 F.2d 163 (3d Cir.1986). The Company points out, however, that there may be "unusual circumstances"—for example, the dissolution of the bargaining agent, a schism in the agent, or a radical fluctuation in the size of the bargaining unit—which may affect the duty to bargain collectively before the one-year period expires. *See Brooks*, 348 U.S. at 98–99, 75 S.Ct. at 178. The Company contends that, in this instance, the transfer of its operations from Easton to Palmer Township constitutes precisely the sort of "unusual circumstances" that obviate its ongoing duty to bargain with the union.

We cannot agree. First of all, the relocation of the Company's operations clearly did not create any of the "unusual circumstances" outlined in the Supreme Court's *Brooks* opinion. *See id.* Since the move was completed, the Union has not undergone dissolution, it has not suffered a schism, and the size of the employee bargaining unit has remained relatively constant. Furthermore, the facts before us indicate that the Company's operations at the Palmer Township plant are virtually identical to its operations at the Easton plant. *See supra* note 1. If the Company were permitted to avoid the Union's certification here, then every time an employer modernized its facility, the Union would effectively be out the door. Accordingly,

we hold that substantial evidence on the record supports the Board's determination with respect to this issue.

## V.

Since the Company's objections to certification of the Union are without merit, and since it tenders no other legitimate reason for its refusal to bargain, the Board's order of July 31, 1986 will be enforced in full.

GARTH, Circuit Judge dissenting:

We have consistently held that certain procedures must be meticulously followed so that no taint infects the laboratory conditions under which an election takes place. *See, e.g., Vitek Electronics, Inc. v. NLRB*, 763 F.2d 561, 571 (3d Cir.1985); *Season-All Industries, Inc. v. NLRB*, 654 F.2d 932, 940 (3d Cir.1981); *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1004 (3d Cir.1981). Nevertheless, in this case, the majority denigrates the importance of these laboratory conditions in union certification elections, maj. op. at 939, in holding that the certification election at Molded Acoustical was neither affected nor flawed by the Union's promise to waive its $50.00 initiation fee only for those employees who *voted for* the Union.

Because I am convinced that this improper inducement impermissibly tainted the laboratory conditions that are essential to a fair and unbiased electoral process, I dissent from the majority judgment.

## I.

The Board concluded that no reasonable employee would have viewed the fee waiver offer as having been restricted to only those who voted in favor of the Union. Appendix at 223, 235. This conclusion must be accepted if supported by substantial evidence on the record considered as a whole. *Black Grievance Comm. v. NLRB*, 749 F.2d 1072, 1074 (3d Cir.1984), *cert. den. sub. nom., Philadelphia Electric Co. v. Black Grievance Comm.*, 472 U.S. 1008, 105 S.Ct. 2704, 86 L.Ed.2d 719 (1985). However, the record as a whole is completely barren of evidence that would support the Board's conclusion.

The Board urges us to consider the fact that the official election notice stated that the election "will be by SECRET ballot under the supervision of the Regional Director of the National Labor Relation's Board." NLRB Brief at 12. However, we have not been referred to any portion of the official record in which such a notification appears. Moreover, even if the official election notice were properly before us, it would be of minimal probative value. Such a notice cannot be relied upon to clear up an ambiguity absent some affirmative evidence that it was at least read by the voting employees, and more fundamentally, that its import, i.e. that "secret" really means "secret," was indeed understood by the employees.

I also cannot attribute any significance to the majority's argument that the inherent ambiguity of the Union leaflet is somehow undercut by the secret nature ·of the balloting procedure. In *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000 (3d Cir.1981), this court was faced with a case in which employees were threatened with physical violence if they did not individually vote in favor of the union in the representation election. Although the threatened employees undoubtedly cast secret ballots, and their intimidators presumably could not discover whether any one of them had in fact voted for the union, the coercion was nevertheless found to be both palpable and real, and this court set aside the election. *Id.* at 1011.

It is abundantly clear that the record as a whole in this case—the record upon which we are asked to find that the Union leaflet is reasonably susceptible to only the interpretation put forward by the Board—consists of nothing beyond the disputed leaflet itself. Indeed, such a conclusion is contrary to the clear meaning of the passage:

> All employees in the bargaining unit will not have to pay the the [sic] $50.00 Initiation Fee *if they vote* for the Teamsters to represent them. Also dues will not be payable until there is a signed contract!

Appendix at 226 (emphasis added). In my view, the language of this passage is both plain and clear: if you vote for the Union, you will not have to pay the initiation fee; if you do not vote for the Union, you will have to pay the fee. This passage, even when read together with the dubious pronouncement that the election is by secret ballot, cannot constitute substantial evidence in support of the Board's conclusion, as the majority holds that it does.

## II.

Although I am convinced that the *proper interpretation* of the above passage is that the fee waiver is being offered only to those individuals who vote in favor of the Union, such a conclusion is well beyond that which is required to invalidate this election. All that need be demonstrated is that the interpretation that I advance be a *plausible interpretation* for an ambiguously phrased offer. The Board has consistently held that *any* ambiguity in an initiation fee waiver offer must be construed against the drafting Union. *Inland Shoe Manufacturing Co., Inc.,* 211 NLRB 724 (1974); *The Coleman Co., Inc.,* 212 NLRB 927 (1974); *Deming Division, Crane Co.,* 225 NLRB 657 (1976). *See also NLRB v. Semco Printing Center, Inc.,* 721 F.2d 886, 889 (2d Cir.1983) ("cases following *Savair* hold that waiver offers, the language of which is ambiguous concerning 'critical details' ... violate *Savair,* notwithstanding how employees may actually construe those offers").[1]

The Board itself virtually conceded the existence of this ambiguity when it noted that the Union's letter "may have been inartfully drafted." Appendix at 223. Regardless of the Board's concession, however, such a conclusion is inescapable.

Because the Union's leaflet statement was at best ambiguous, and because reasonable employees therefore could have taken the Union's statement to have been an improper inducement to vote in favor of the Union, the election failed to conform to the laboratory conditions that this court has consistently required. *Vitek Electronics, Inc. v. NLRB,* 763 F.2d 561, 571 (3d Cir.1985) ("extreme care must be taken that the laboratory conditions have not become so tainted that employees may have based their vote not upon conviction, but upon fear or upon any other improperly induced consideration"); *Season-All Industries, Inc. v. NLRB,* 654 F.2d 932, 940 (3d Cir.1981) ("in establishing and maintaining the 'laboratory conditions' conducive to an election, no conduct disruptive or destructive of the exercise of a voter's free choice can be tolerated"); *Zeiglers Refuse Collectors, Inc. v. NLRB,* 639 F.2d 1000, 1004 (3d Cir.1981) ("a representation election should be 'a laboratory in which an experiment may be conducted under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees' ").

The Union's offer unquestionably constitutes an inducement that must invalidate the election result. This election, therefore, should be set aside.

Indeed this case is indistinguishable from other Board decisions setting aside elections because of impermissibly ambiguous fee waiver offers. In *Inland Shoe Manufacturing Co., Inc.,* 211 NLRB 724 (1974), a secret ballot certification election resulted in a Union victory which was contested by the employer. The employer argued that one of the Union's campaign leaflets violated the *Savair* rule. The leaflet stated: "There are no initiation fees for charter members of a new local (and that is what you would be). Monthly dues will start when a contract has been made with the Company." *Id.*

In *Inland Shoe* there was ample evidence that the Union's fee waiver offer was intended to waive fees for all individuals who were employed at the time of the Union's acceptance. A union organizer had properly explained at an organization meeting that all employees working at the time of the election would be charter members,

---

**1.** The holding of *NLRB v. Savair Manufacturing Co.,* 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), is that a Union's offer to waive initiation fees for only those members who sign recognition slips prior to an election impermissibly allows the Union to buy endorsements. *A fortiorii,* a Union's offer to waive initiation fees for only those members who vote for the Union, is an impermissible bribe that should invalidate the election result.

and that only those hired after the election would be subject to the initiation fee. Additionally, the Union's bylaws required that waiver of initiation fees must apply to all persons who were employees on the date of election. The Board found, however, that the leaflet was ambiguous; some employees may have believed that the initiation fee would be waived only for those signing authorization cards before the election was held. "We find that employees who read Petitioner's leaflet could reasonably have concluded that it was to their benefit to join Petitioner before the election." 211 NLRB at 725.

In *Inland Shoe*, the testimony of the witnesses concerning the Union's bylaws and representations at an organizational meeting were not sufficient to eliminate the possibility that some employees may have been misled by the leaflet, and the Board set aside the election. In the instant case, where the record is completely barren of evidence that would serve to clear up the ambiguity in the Union's leaflet, we are required to do no less.[2]

The majority's attempt to distinguish *Deming Division, Crane Co.*, 225 NLRB 657 (1976) is similarly unsuccessful. The majority argues that the *Deming Division* holding is limited to condemning improper pro-union support which occurs prior to the representation election. Maj.Op. at 938 n. 4. Such a distinction fails not only by its own logic, but also under the explicit holding of the case. First, if it is impermissible to attempt to influence an election through the use of pressure to garner sufficient union authorization cards pre-election, it is *a fortiorii* impermissible to attempt to improperly influence the more important certification election for which the authorization cards are but a precursor. Moreover, as stated in the passage from the case that the majority itself quotes, *Deming Division* held that a waiver of fees is impermissible not only when it

is connected to support for the union before the election [as in the signing of union authorization cards] but also when it is *related to a vote in the election.* Maj.Op. at 938 n. 4 (quoting *Deming Division*, 225 NLRB at 659).

"The Board and the courts have emphasized that the existence of a coercive atmosphere, regardless of how such an atmosphere came about, is the critical fact upon which the Board should focus in determining whether a fair and free election was impossible." *Zeiglers Refuse*, 639 F.2d at 1005. Here, I am forced to conclude that the eligible voters were presented with an improper inducement to vote in favor of the Union. I must therefore dissent from the majority's opinion and judgment in this matter. I would grant Molded Acoustical's petition for review, order the December 30, 1983 election set aside, and deny the Board's cross petition for enforcement.[3]

---

2. It is important to note that the result of this election would have been changed by a swing of only three votes. Appendix at 222. This court should be particularly scrupulous in insuring that fair conditions surrounded a closely contested election. *See Savair,* 414 U.S. at 278, 94 S.Ct. at 499 (noting that a swing of only one

vote in that election would have changed the result).

3. In light of the fact that I would hold the certification election invalid, I do not find it necessary to address the other claims made by the company.