**SEASON–ALL INDUSTRIES, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–2096.**

United States Court of Appeals, Third Circuit.

Argued March 23, 1981.

Decided July 17, 1981.

Rehearing and Rehearing In Banc Denied September 15, 1981.

Barton Z. Cowan (argued), G. Robert Moore, William H. Schorling, Stuart A. Williams, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for petitioner.

Marjorie S. Gofreed (argued), William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Washington, D. C., for respondent.

Before ADAMS and GARTH, Circuit Judges, and DUMBAULD, District Judge.*

* Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

GARTH, Circuit Judge.

Once again we are asked to review the denial of a hearing by the Regional Director of the National Labor Relations Board when grave assertions are made by the company that the "laboratory conditions" of a representation election were violated by actions of a union agent.

We have recently addressed different aspects of this subject in *Anchor Inns Inc. v. NLRB*, 644 F.2d 292 (3d Cir. 1981); *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000 (3d Cir. 1981); and *NLRB v. Campbell Products Dept.*, 623 F.2d 876 (3d Cir. 1980). In *Zeiglers* we reviewed the election process *after* an evidentiary hearing had been held to investigate irregularities. In *Anchor Inns,* we reviewed the election process where an evidentiary hearing had been sought by the company and denied. In *Campbell,* no evidentiary hearing was required because the Board assumed the truth of Campbell's contentions.

Here, Season-All seeks an evidentiary hearing to examine the conduct and status of one of its employees (Sadler) who it asserts was a union agent and whose electioneering activities, Season-All claims, influenced co-workers outside the polling place while they were waiting their turn to vote.

The Regional Director conducted only an *ex parte* investigation despite the company's assertion that Sadler was a union agent and had identified himself with the union by saying that he was there "for the union, to keep management away from the polling area."

The Board sustained the Regional Director's refusal to investigate Sadler's status and issued an order directing Season-All to bargain with the union. Consistent with our recent pronouncements, we grant Season-All's petition, deny the Board's cross-application for enforcement and remand the case to the Board for an evidentiary hearing.

## I.

Season-All Industries, Inc. produces thermal windows and doors. At issue in this case, is the representation of Season-All's employees by the International Association of Machinists and Aerospace Workers, AFL–CIO (IAM).

A petition seeking a representation election was filed with the Board on April 2, 1979 by District Lodge No. 63 of the IAM. The election was held on June 29, 1979 and the relevant results were tabulated as follows:

Approximate number of eligible voters .... 79
Votes cast for IAM .................... 36
Votes cast for [other unions] ............. 9
Votes cast against participating labor
organizations ....................... 25
Valid votes counted ................... 70
Challenged ballots .................... 5

Challenges are sufficient in number to
affect the results of the election.

After the election, on July 5, 1979, Season-All filed objections to the conduct of the election. Season-All objected that "[a]n agent of the International Association of Machinists and Aerospace Workers engaged in electioneering outside the polling place." Season-All also alleged that Sadler urged waiting voters to vote for the union; that Sadler harassed female employees whom he felt were not favorably disposed to vote for the union; and that Sadler, by declaring that a company officer was improperly present at the polling area, implied to the voters that the company was engaged in wrongful conduct. The company charged that Sadler conducted his electioneering for a substantial part of the one hour period allotted for voting and within a few feet of the room where voting was taking place. In support of its objections, the company submitted affidavits of Thomas Mittlehauser, the assistant to the company's Industrial Relations Director. The charges in the affidavits supported the objections filed by the company and, among other things, claimed that Sadler had stood outside the polling place for some time and had told Mittlehauser in a loud voice that he, Mittlehauser, was not permitted near the voting place because of his position with the company.

After an *ex parte* investigation the Regional Director issued a Supplemental Decision on Objections and Challenges. He found that "Sadler was a rank-and-file employee and an eligible voter.... [and] held no position of any kind for the [union]...." (133a) The Regional Director "conclud[ed] that Sadler's conduct ... can in no way be attributable to the Petitioner," although he conceded that "[i]n *Milchem, Inc.,* 170 NLRB 362 [other courts and the Board most often cite this case as *Milchem, Inc.* although it was originally reported as *Michem, Inc.* Because many of the cases to which we refer cite the case as *Milchem,* we will use that nomenclature throughout this opinion.], the Board held that in situations where a *party to the proceeding* in cases of electioneering which is more than *de minimis* at the polling place while voting is in progress, the Board will find such electioneering to be *per se* a basis for setting aside an election." (134a) He distinguished *Milchem,* however, by stating that in *Milchem,* the "conduct complained of was engaged in by an agent of the union...." *Id.*

The Regional Director described the testimony concerning Sadler as follows:

All of the alleged objectionable conduct attributed to the alleged agent of the Petitioner relates to conduct of a rank-and-file employee, Ray Sadler. Sadler was an eligible voter.

The election was held in an enclosed conference room at the Employer's facility, entered through a doorway. The voting period was from 11 a. m. to 12 noon. The corridor where employees were waiting in line to vote was located outside the doorway of an office area located between the corridor and the conference room. According to Thomas Mittlehauser, the Employer's assistant to the industrial relations director, he found it necessary to walk by the employees waiting in line to vote on his way to the nurse's office shortly after the polls opened; that on his way to the nurse's office, he noticed Sadler standing in the corridor, but not in the line of waiting voters; that on

his return from the nurse's office, approximately 5 to 8 minutes later, he saw Sadler standing in the same position as previously; and that on this occasion, Sadler said to him, "What are you doing here, you have no right to be here, you are management," to which Mittlehauser responded "that he had been busy treating an employee and was on his way back to his office," and that Sadler then merely shrugged his shoulders. According to Mittlehauser, he also saw Sadler converse with some of the other employees in the line, but he did not know what Sadler said to such employees. According to one employee, she saw Sadler standing in the corridor greeting employees, such as saying "hello" or "how are you"; that one of the voters asked Sadler where his button was and that Sadler replied "it's against the law to wear them but we all know who to vote for." According to another employee, Sadler, while standing in the corridor, said to her, "thanks for coming to vote" to which she replied "so you think"; that Sadler shook the hand of an employee who had already voted and said "congratulations"; and that when someone asked Sadler why he was standing where he was, Sadler replied that he was there "for the Union, to keep managemen [sic] away from the polling area" and that he "did not want management to intimidate us." According to the same employee, Sadler talked to various employees in the line to say hello and "small talk" and that while he said things about the Union, she could not recall the specifics. A third witness waiting in line to vote, whose supervisory status is in dispute, states that Sadler got in line behind her; that as a voter passed the waiting line after voting that person said "we may get a vacation out of this" to which the witness replied to no one in particular, "perhaps an extended one"; that Sadler then said "I'm glad she brought that up because we will use it against her later; we will use that against them later"; that Sadler then said there will be no more favoritism that some people get raises and some don't; and that Sadler

continued conversing with voters while in the line but that she paid no attention and did not know what was said. All of the above three witnesses are females. Except as set forth above, the investigation did not disclose any other remarks attributed to Sadler pertaining to the election. The estimates of the witnesses as to the length of time that Sadler was in the polling area ranges from 10 to 20 minutes. The estimates of the witnesses as to where Sadler stood while making his remarks ranges from 10 feet from the entrance to the polling place to 40 feet from the entrance to the polling place.

According to Sadler, he stepped out of the voting line when he saw Mittlehauser come back past the voting line and told Mittlehauser that he was violating the rules, that he was not supposed to . be there and asked Mittlehauser to leave; that he then waited for the end of the line to reach him, there being approximately 25 people in line, and that when the end of the line reached him, he got back into the line, voted, and left the polling area. According to Sadler, while he thanked people for voting as they left the polling area, he did not thank anyone for voting any particular way, did not say "congratulations" to anyone, and did not say "that we would use anything" against anyone. While agreeing that he stated that management was not supposed to be in the area and that he was watching out for violations after the Mittlehauser incident, he denies that he told anyone that he was "there for the Union to keep management away from the polling area." (131a–132a)

Evaluating this conduct according to the Board's standards for union *adherents*, i. e. non-parties as opposed to union agents, the Regional Director found that the conduct at issue did not substantially impair the employees' exercise of a free choice in light of all the surrounding facts and circumstances. Viewing "the evidence in the light most favorable to the Employer" the Regional Director found "that Sadler's conduct did not interfere with the results of the elec-

tion." (135a) The Regional Director went on to order a hearing limited "to the issues raised by the challenges to" four of the ballots cast in the election. (137a)

Three days later, Season-All filed a motion with the Board seeking to have the Board reconsider its decision. Season-All stated that "[c]ertain of the factual conclusions set forth in the Supplemental Decision constitute findings of fact with respect to conflicting evidence, which findings should not be made absent a full hearing." (139a) Season-All contended that a proper investigation of the case, including a full hearing, would disclose that Sadler was one of four members of the in-shop union organizing committee and that his position was well known to the other employees. Moreover, Season-All argued that under the Board's decision in *Pastoor Brothers, Inc.*, 223 NLRB 451 (1976) the conduct of Sadler established that he should be considered a union agent if he so represented himself to the employees.

On October 1, 1979, the Regional Director denied Season-All's motion for reconsideration. The Board affirmed this ruling on November 13, 1979. On April 3, 1980 the IAM was certified as the representative.

After Season-All refused the IAM's request to bargain collectively, the Regional Director issued a complaint and notice of hearing on May 12, 1980. Season-All filed an answer on May 22, 1980 in which two of its objections centered on Sadler's status and conduct and the NLRB's failure to hold a hearing concerning those issues. It also objected to having its computer programmers included in the bargaining unit as it claimed they were professionals within the terms of 29 U.S.C. § 159(b)(1).[1] Its fourth objection pertained to a managerial employee, who, it alleged, was improperly included in the bargaining unit. This last objection was subsequently abandoned at oral argument.

The General Counsel then moved for summary judgment which was granted by the Board.

## II.

Although Season-All continues to press its objection that its computer programmers were improperly included in the bargaining unit, Season-All's primary complaint focuses on the Regional Director's refusal to grant an evidentiary hearing with respect to Sadler's status and conduct. Because we conclude that this latter objection is well-founded, we will vacate the decision of the Board and remand the case for a hearing and a factual determination with respect to Sadler's affiliation with the union committee and his activities.

## A.

As the Regional Director explained in his supplemental decision, the Board established a *per se* rule, as long ago as 1962, in *Milchem, supra*, that electioneering by a party to an election while the election is being held requires that the election be overturned.

In *Milchem*, the secretary-treasurer of the union had stood for several minutes near the line of employees who were waiting to vote. While there, he engaged them in conversation which he stated concerned only the weather and like topics. The Board, while acknowledging the innocuous character of these conversations nevertheless held that "sustained conversation with respective voters waiting to cast their ballots, regardless of the content of the remarks exchanged, constitutes conduct, which, in itself, necessitates a second election." *Milchem, supra* at 362. The Board went on to explain the basis for this holding. It stated:

---

1. 29 U.S.C. § 159(b)(1) reads in relevant part:

   (b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the union appropriate for the purposes of collective bargaining shall be the employer unit, craft unit,

plant unit, or subdivision thereof: *Provided* the Board shall not (1) decide that any unit is appropriate for such purposes if such unit includes both professional employees and employees who are not professional employees unless a majority of such professional employees vote for inclusion in such unit . . .

Careful consideration of the problem now convinces us that the potential for distraction, last minute electioneering or pressure, and unfair advantage from prolonged conversations between representatives of any party to the election and voters waiting to cast ballots is of sufficient concern to warrant a strict rule against such conduct, without inquiry into the nature of the conversations. The final minutes before an employee casts his vote should be his own, as free from interference as possible. Furthermore, the standard here applied insures that no party gains a last minute advantage over the other, and at the same time deprives neither party of any important access to the ear of the voter. The difficulties of recapturing with any precision the nature of the remarks made in the charged atmosphere of a polling place are self-evident, and to require an examination into the substance and effect of the conversations seems unduly burdensome and, in this situation, unnecessary. Finally, a blanket prohibition against such conversations is easily understood and simply applied.

This rule is nothing more than a preventive device to enforce the ban against electioneering in polling places normally applied in political elections and in our representation elections. It serves the same purposes of maintaining order and permitting voters to consult their own consciences without interruption. Additionally, by attaching a sanction to its breach, the rule assures that the parties will painstakingly avoid casual conversations which could otherwise develop into undesirable electioneering or coercion. In our view, the restriction here established gives every promise of having a salutary effect on the conduct of elections and offers no likelihood of abridging the rights of the parties concerned.

We intend, of course, that our application of this rule will be informed by a sense of realism. The rule contemplates that conversations between a party and voters while the latter are in a polling area awaiting to vote will normally, upon the filing of proper objections, be deemed prejudicial without investigation into the content of the remarks. But this does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election. We will be guided by the maxim · that "the law does not concern itself with trifles." We trust, however, that the parties to the elections, in order to obviate the sometimes troublesome task of defining what is to be considered trifling, will take pains to assure complete compliance with the rule by instructing their agents, officials, and representatives simply to refrain from conversing with prospective voters in the polling area.

170 NLRB 362–63.

The Regional Director sought to distinguish *Milchem* by stressing the fact that, in *Milchem*, it was undisputed that it was an officer of the union—"a party to the election"—who was the offending individual. (134a) The Regional Director, in his decision, then stated:

Inasmuch as I have found that Sadler was not an agent or representative of the Petitioner, I conclude, therefore, that there is no basis under the above-cited cases [e. g. *Milchem, Pastoor, supra*] for setting aside the election. on a per se standard, since the conduct involved was not engaged in by a party to the election. (135a)

Significantly, he did not comment on the conflicting evidence as to Sadler's *status*.[2] Indeed, the Regional Director's findings as to Sadler's status, while acknowledging the company's assertion that Sadler claimed to have been "there for the Union to keep

---

**2.** The Regional Director did acknowledge that the record before him contained conflicting evidence as the Sadler's comments. We observe that the comments allegedly made by Sadler in the present case are far more egregious in con-

tent than the innocent conversations held in *Milchem, Inc.*, 170 NLRB 362 (1962), which nevertheless resulted in the *Milchem* election being vacated.

management away from the polling area," (135a), does not indicate the evidence on which these findings of "non-party" were predicated. His decision continued:

As previously indicated, Sadler was a rank-and-file employee and an eligible voter. Although Sadler wore a Petitioner button, he held no position of any kind for the Petitioner, nor had he been designated to act for the Petitioner in any way. He was not an officer of the Petitioner, was not a member of any committee of the Petitioner and had not been designated to act as an election observer by the Petitioner. The investigation failed to disclose any evidence that Sadler had been required by the petitioner to police the area where the voters were waiting in line to vote and, indeed, the investigation failed to establish any evidence that the Petitioner was even aware of Sadler's actions.

In these circumstances, I conclude that Sadler was not an agent of the Petitioner, noting particularly that he held no position of any kind with the Petitioner, had not been designated by the Petitioner to act for it and that the Petitioner in no way authorized, condoned or was even aware of Sadler's activities. A rank-and-file employee's adherence to or preference for a labor organization is not sufficient to constitute such person an agent of a labor organization. Consequently, I conclude that Sadler's conduct, in question here, can in no way be attributable to the Petitioner.

(133a–34a).

In both *Anchor Inns, Inc. v. NLRB*, 644 F.2d 292 (3d Cir. 1981) and *NLRB v. Campbell Products*, 623 F.2d 876 (3d Cir. 1980), this court held that "[a] party is entitled to an evidentiary hearing where its objection raises substantial and material issues of fact. . . . As a corollary, no hearing is necessary where the Board assumes the truth of the party's contentions, and then rules as a matter of law that, assuming the facts alleged, the challenged conduct does not warrant setting aside the election." *Anchor Inns, supra*, p. 296 quoting *NLRB v. Campbell Products Dept.*, 623 F.2d 876, 879 (3d Cir. 1980).

"In *Campbell Products*, the employer alleged that a union supporter had been electioneering during the course of balloting. The Board assumed the allegation to be true and, relying on the traditional distinction drawn between activities undertaken by the *parties* to an election and those undertaken by *rank and file employees*, overruled the objection." *Anchor Inns, supra*, at 296 (emphasis supplied). The *Campbell* court focused not on the electioneering objection presented by Campbell, but rather on a second objection raised by Campbell which alleged that the Board had failed to adhere to its own policy and precedents by failing to consider the company's objection which had been filed beyond the five day period specified in the Board's regulations. In *Campbell*, therefore, while we overruled the Board with respect to Campbell's second objection, we upheld the Board's action in rejecting the electioneering complaint. We did so, because in *Campbell*, no question was ever raised as to the status of the employee—i. e. whether he was a mere employee, or a union agent, and of equal importance the Board had in fact "assume[d] the truth of [Campbell's] contentions" that the offender was no more than an employee. 623 F.2d at 879.

Here, however, the circumstances are dramatically different from those which we confronted in *Campbell Products*. In the present case, Season-All has asserted that Sadler was a union *agent* and that as a union agent he was electioneering during the balloting and this assertion was never assumed to be true by the Regional Director.

Similarly, in *Anchor Inns*, a precedent in this Circuit directly on point, one of the company's complaints which led us to remand for a hearing, was that the status of the offending employee as a union agent had not been assumed as true and no hearing had been held by the Regional Director to resolve that issue. Thus, *Anchor Inns's* observations are instructive in this case. As we observed there:

In *NLRB v. Claxton Manufacturing Co.,* 613 F.2d 1364 (5th Cir. 1980), the Board, as in the case at bar, apparently believed that it was not required to decide whether the objector's affidavits raised substantial and material issues that prima facie warranted setting aside the election. Rather, the Board concluded that it might await the results of the regional director's ex parte investigation and credibility determinations before deciding whether a hearing might be warranted. The Fifth Circuit rejected such a procedure and declined to enforce the bargaining order. 613 F.2d at 1373. We find the Fifth Circuit's approach persuasive in this case. It would of course serve no useful purpose to require the Board to hold hearings when the evidence proffered will not affect the validity of the election. However, in order to give the objecting party the full benefit of its statutory and constitutional hearing rights it is necessary that at some point the Regional Director or the Board, in determining the substantiality and materiality of the factual issues raised by an objection, assume that the allegations contained in that objection are true. This was not*done in the case at bar. Had the allegations been taken as true, they may have warranted setting aside the election.

644 F.2d at 296.

██ Here, the Regional Director did not assume the truth of Season-All's allegation that Sadler was a union agent. Rather the Regional Director "substituted 'facts' gleaned from his *ex parte* investigation for the Company's allegation." *Id.* at 297. His finding that Sadler "held no position of any kind for the [union], nor had he been designated to act for the [union] in any way," completely controverted Season-All's allegations. Thus, the findings which are reported in his decision not only are unsupported by evidence of record, but are even more seriously flawed, in that Season-All was precluded from participating in an evidentiary hearing at which it could examine Sadler and other witnesses and present its evidence and arguments.

The record clearly discloses that Season-All's initial objection to the election asserted that Sadler was an agent of the union. Paragraph four of Season-All's objection reads

4. During a substantial part of the period designated for voting, Roy Sadler, an agent of the International Association of Machinists and Aerospace Workers ("Petitioner"), engaged in electioneering activities in the corridor within a few feet of the door of the conference room in which voting was taking place.

Moreover, Season-All claimed that Sadler urged waiting voters to vote for the union; that he badgered employees whom he felt were not favorably disposed towards the union; that he influenced voters; that he implied that the company was engaged in wrongful conduct and that he conducted his electioneering outside of the entrance to the polling room for a substantial portion of the time allotted for voting. These charges were supported by affidavits filed both before and after the Regional Director's decision. While it is true that the affidavits filed prior to the decision did not specifically assert that Sadler was a union agent, Season-All's filed objections consistently maintained that Sadler was an agent of the union. Indeed, an affidavit filed by Season-All's industrial relations director subsequent to the union's certification and in response to the June 6, 1980 motion of the General Counsel for summary judgment, stated unequivocally that Sadler, together with three other named individuals, as a committee "repeatedly presented itself to Season-All management as having some connection with the [union]." (322a)

We recognize that this latter affidavit was not before the Regional Director prior to his refusal to hold a hearing on the company's charges. However, the assertions made by Season-All in its efforts to obtain an evidentiary hearing were more than sufficient under the standard announced in *Anchor Inns, supra,* to "prima facie warrant setting aside the election." *Anchor Inns* at 296. The following standard announced in *Anchor Inns* was satisfied in full by Season-All:

In order to obtain an evidentiary hearing, the objector's proffer of evidence must prima facie warrant setting aside the election. The proffer may not be conclusory or vague; it must point to specific events and specific people.

*Id.* at 296. *Cf. Vitek Electronics, Inc. v. NLRB,* 653 F.2d 785, at 794–795 (3d Cir. 1981).

Season-All's proffer was neither conclusory nor vague. It referred to specific events (time, place and conversations) and specifically identified Sadler as the person whose conduct was being challenged.

Our conclusion in this respect is buttressed by the Fifth Circuit's decision in *NLRB v. Carroll,* 636 F.2d 111 (5th Cir. 1981). There, as here, electioneering took place while employees were waiting to vote.[3] The electioneering activities were conducted by two former Carroll employees. There, as here, the Board contended that the electioneering that occurred was not improper because the *Carroll* employees were not agents of the union and thus their conduct could not be attributed to the union. The court's response put that argument to rest:

It is well settled that acts not attributable to the union warrant setting aside the election if the acts disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election. *NLRB v. Claxton Manufacturing Co.,* 613 F.2d 1364, 1371 (5th Cir. 1980). In *Home Town Foods, Inc. v. NLRB,* 379 F.2d 241 (5th Cir. 1967), this court stated:

We are not impressed with the argument that all coercive acts must be shown to be attributable to the union itself, rather than to the rank and file of its supporters. "The important fact is that such conditions existed and that a free election is hereby rendered impossible." *Diamond State Poultry Co.,* 107 NLRB 3, 6 (1953).

379 F.2d at 244.

636 F.2d at 113.

■ *Carroll,* recognizing that Board policy prohibited electioneering "at or near the polls," denied enforcement of the Board's order. Our reading of *Carroll* indicates that the Fifth Circuit does not restrict the *per se* rule of *Milchem* to parties but holds that even a *non-party* who disrupts the voting procedure or destroys the atmosphere necessary to the exercise of a free choice in an election, warrants the setting aside of the election.[4] We agree that in establishing and maintaining the "laboratory conditions" conducive to an election, no conduct disruptive or destructive of the exercise of a voter's free choice can be tolerated, regardless of whether the actions are those of a union agent or a mere employee. However, the failure to afford a hearing to Season-All in this case precludes us from making the determinations which compelled the *Carroll* court to set aside the election there. It was the same failure to hold a hearing after a *prima facie* case had been established by the employer in *Anchor Inns,* that prompted the court there to remand for an evidentiary hearing to resolve the essential issues bearing on the fairness of the *Anchor Inns* election.[5] Thus, both

---

**3.** *NLRB v. Carroll,* 636 F.2d 111, 113 (5th Cir. 1981), also held that

Once the polls opened, the employees waiting outside in line to vote became a part of the polling place, and were entitled to the safeguards against interference espoused by *Milchem.*

We agree, for just as the court in *Carroll* found, we do not regard protection from interference to be reserved for only those employees who have gained access to the actual polling place. Voters, in the last few moments before voting, must be "as free from interference as possible." *Milchem, Inc.,* 170 NLRB 162–63 quoted in text, *supra* p. 937.

**4.** To the extent that *Carroll* interprets Claussen Baking Co., 134 NLRB 111 (1961), as requiring an election to be set aside whenever *any* electioneering takes place, *Carroll's* holding may be read as more far reaching in this respect than the decisions thus far in this Circuit. *Cf. NLRB v. Campbell,* 623 F.2d 876, 879 n.2 (3d Cir. 1980). Regardless of the reach of *Carroll,* under the circumstances of this case, we are constrained to follow the precedent of *Anchor Inns, Inc. v. NLRB,* 644 F.2d 292 (3d Cir. 1981).

**5.** The dissent, while acknowledging that *Anchor Inns* establishes the governing legal standard for determining when the Board should

precedent and logic compel the same result in this case where Sadler's conduct and status have been disputed and put in issue by Season-All, but have never been the subject of an evidentiary hearing and therefore have never been properly resolved.

### B.

■ Season-All also objected to the Board's determination that its computer programmers were not professional employees as that term is defined in 29 U.S.C. § 152(12).[6] If the computer programmers were professional employees, they could not be included in a bargaining unit with non-professional employees unless a majority of such professional employees were to vote for inclusion in such a unit. See 29 U.S.C. § 159(b)(1) quoted *supra* at p. 936 n.1. No such separate election was ever held because the Board concluded that the computer programmers were not professional employees.

The hearing held on April 17, 1979 resulted in an opinion of the Regional Director dated May 16, 1979, which was affirmed by the Board. That opinion states in relevant part:

> The record discloses that computer programming requires special education or training above the high school level of at least two years. However, the Employer does not require a four-year college degree and it is in business education with four courses relating to computer programming. The other two programmers attended one or two year technical schools which prepared them as trainees. The record further reveals that substantial additional time is required before a trainee becomes fully qualified as a programmer.

conduct an evidentiary hearing (dissenting op. typescript at 1) apparently views the allegations in that case differently than do we. The dissent asserts that *"Anchor Inns* requires more substantial evidence than [Season-All provided] on the question of Sadler's status." Dissenting op. typescript at 3. Our reading of *Anchor Inns* persuades us that there is no difference in either the content or the quality of the allegations in the two cases.

In *Anchor Inns,* as here, the company filed *objections to the Regional Director's report* claiming that an evidentiary hearing on the objections should have been had. In addition to the objections made to the remarks of the alleged agent, Anchor Inns complained that:

> it should not have been held responsible for failing to produce evidence of Victor's *agency status* with the union. The strictures of Section 8(a)(1), it was argued, precluded [Anchor Inns] from engaging in the type of investigation that would produce competent evidence of an agency relationship.

644 F.2d at 294–95 (footnote omitted, emphasis supplied)

Anchor Inns also asserted that even if Victor was not a union agent, his conduct tainted the election process. Similar allegations were *made in Season-All's objections and are discussed in text above.*

Thus, to the extent that *Anchor Inns* determined that an *ex parte* investigation by the Regional Director was insufficient in the face of specific allegations of misconduct by an alleged union agent, we can discern no differences between *Anchor Inns* and this case. Nor does our direction that an evidentiary hearing be held in any way implicate the teaching of *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) (dissenting op. typescript at 1). We do no more here than require adherence to the Board's own policies which require an evidentiary hearing when objections raise substantial and material issues of fact. See *Anchor Inns* at 296.

6. The term "professional employee" means—
(a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or
(b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).

The record reveals that pursuant to a request for information from any of the employer's departments, the programmers develop computer programs to extract the information from the computer in a useable form. The record indicates that the formulation of such programs requires the exercise of judgment and the programs are developed without supervision.

\*    \*    \*    \*    \*    \*

While knowledge of the type described in [29 U.S.C. § 152(12)(a)(iv) quoted at footnote 5, *supra*] might be desirable for a programmer to have, it is clear that their work does not require it. Further, the record fails to establish that the computer programmers are engaged in other than pure programming activities. Accordingly, inasmuch as the Employer's computer programmers do not satisfy all of the requirements of Section 2(12), I find that they are not professional employees as defined by that Section of the Act. At best, the computer programmers are technical employees. Inasmuch as the parties have agreed to include technical employees, I find that the Employer's computer programmers are appropriately included in the unit.

85a–86a (footnotes omitted).

While the Board has previously determined that a systems analyst with wide discretion and significant amounts of technical training might be considered a "professional employee" in certain situations, *see e. g. Aeronca, Inc.*, 221 NLRB 326 (1975), it has generally considered computer programmers to be technical and thus non-professional employees. *See e. g., Westinghouse Electric Corp. v. NLRB*, 440 F.2d 7, 9–10 (2d Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971); *U.S. Postal Services*, 210 NLRB 477, 488 (1974); *Computer Systems, Inc.*, 204 NLRB 255 (1973).

Here, the Board's factual determination that the computer programmers are not "professional employees" is "supported by substantial evidence on the record considered as a whole" 29 U.S.C. 160(f), and giving our usual deference to the Board's expertise in a classification context, we conclude that the Board did not err in its ruling. *See NLRB v. McQuaide, Inc.*, 552 F.2d 519, 532–33 (3d Cir. 1977); *Mon River Towing, Inc. v. NLRB*, 421 F.2d 1, 5 (3d Cir. 1969). *But see* Note, *The NLRB and Supervisory Status: An Explanation of Inconsistent Results*, 94 Harv.L.Rev. 1713 (1981).

### III.

Having determined that Season-All was improperly denied an evidentiary hearing with respect to Sadler's status and conduct, we will grant Season-All's petition for review; we will deny the Board's cross-application for enforcement of its August 1, 1980 order; and, we will remand the case for an evidentiary hearing and for further proceedings consistent with this opinion.

Costs will be taxed against the respondent.

ADAMS, Circuit Judge, dissenting.

I agree with the majority that our recent decision in *Anchor Inns, Inc. v. NLRB*, 644 F.2d 292 (3d Cir. 1981), establishes the governing legal standard for determining when the Board should conduct an evidentiary hearing concerning allegations of election misconduct. I believe, however, that in this case Season-All did not satisfy the threshold requirement of *Anchor Inns*.

According to *Anchor Inns*, unsubstantiated allegations by the party objecting to an election will not suffice to compel the Board to undertake a hearing. Rather, "to obtain an evidentiary hearing, the objector's proffer of evidence must prima facie warrant setting aside the election. The proffer may not be conclusory or vague; it must point to specific events and specific people." 644 F.2d 292, 296.

Although hearings generally serve a useful purpose, requiring a hearing in the absence of a factual predicate warranting such an inquiry provokes unnecessary delay in the administrative process at the expense of the choice of a majority of the workers. Furthermore, we must be mindful of the admonition by the Supreme Court in *Ver-*

*mont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), that "absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure." Under the majority opinion, the Board's rule that there should be a hearing only when the objecting party specifically substantiates its allegations is, in effect, abrogated. In its stead the majority would substitute a court-crafted rule that there must be a hearing even when the allegations are vague and unsupported.

The issue on which Season-All requests a hearing involves Sadler's status with the union.[1] Thus, under *Anchor Inns,* we must ascertain whether the employer proffered "substantial and material" evidence that Sadler was a union agent. The offerings by Season-All on this issue are, at best, conclusory and vague, and they fall short of being substantial. In its complaint, Season-All contended that "Sadler, *an agent* of the [IAM], engaged in electioneering. . . ." (emphasis added). The employer then detailed the content of the statements that purportedly constituted electioneering. As to the allegations of union agency, the critical issue in this appeal, the company merely came forward with a single, vague item of evidence to support the claims of union agency. Season-All asserted that Sadler stated he was at the polling place because he was "for the union."[2] This enigmatic statement suggests that Sadler supported the union, rather than that Sadler held a position with the union.

The majority concludes that Season-All satisfied the requirements in *Anchor Inns* of concreteness and substantiality when it "referred to specific events (time, place and conversations) and specifically identified Sadler as the person whose conduct was being challenged." Maj. op., typescript at 940. But, these allegations by Season-All pertain only to the question of whether Sadler's comments were coercive; they are not apposite to the question of Sadler's position within the union.

All that Season-All offered on this crucial issue were the cryptic statement adverted to earlier and the conclusory allegation that Sadler was an agent. To warrant a hearing on the question of Sadler's status, *Anchor Inns* requires more substantial evidence than this. Also relevant here is the observation in *Anchor Inns* that "it would of course serve no useful purpose to require the Board to hold hearings when the evidence proffered will not affect the validity of the election." 644 F.2d at 296. The proffered evidence—that Sadler said he was "for the union"—is not of sufficient import to affect the election certification. Moreover, after an investigation the Regional Director found no evidence that Sadler either held a position with the union or had been designated by the union to police the polling area.

When the evidence produced by Season-All in the present case is measured against the substantiality requirement of *Anchor Inns,* it appears that the Board did not err when it declined to hold a hearing on the question of Sadler's union position. Inasmuch as I am bound by *Anchor Inns,* decided only a few months ago, I respectfully dissent from the portion of the majority opinion that directs the Board to hold a hearing.

1. The NLRB rule advanced in *Milchem, Inc.,* 170 NLRB 362, would apply only if Sadler is found to have been a representative of the union. In *Milchem* it was undisputed that the person who made the allegedly improper remarks was a union official, so the Board devised a rule to cover statements by parties to the election. This rule is largely inapposite to the narrow procedural issue presented in this case, because the inquiry into Sadler's union status is distinct from and preliminary to any consideration of *Milchem.*

2. As the majority correctly points out, it was not until the unfair labor practice proceedings, a year after the election, and well after the Board had considered the need to hold a hearing, that Season-All, in objecting to the General Counsel's motion for summary judgment, alleged for the first time that Sadler had held himself out to the company as a member of a union committee, even though he was not on the official list of union representatives. (A.324).