**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SILVERMAN'S MEN'S WEAR, INC., Respondent.**

**No. 80–2574.**

United States Court of Appeals, Third Circuit.

Argued May 19, 1981.

Decided Aug. 6, 1981.

As Amended Aug. 17, 1981.

Howard E. Perlstein, James D. Donathen, (argued), N. L. R. B., Washington, D. C., for petitioner.

William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B., Stephen J. Cabot, Barry F. Bevacqua (argued), Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for respondent.

Before ADAMS, ROSENN, and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT
## PER CURIAM:

█ The National Labor Relations Board ("NLRB" or "Board") applies for enforcement of a bargaining order issued to Silverman's Men's Wear, Inc. ("Company" or "Employer"). 29 U.S.C. § 160(e). The order[1] directs the Company to recognize and bargain with General Warehousemen and Employees' Union Local 636 ("Union") as the lawfully certified collective bargaining representative of the Company's employees at its Warrendale, Pennsylvania, warehouse and distribution center. The Company admits refusal to bargain, but defends against the unfair labor practice charge on the ground that the Board's Regional Director should have held a hearing on the Company's objections to the election which led to the Union's certification.[2] Because we believe that one of the objections necessitated a hearing, we deny enforcement.

### I.

The bargaining unit at the Company's distribution warehouse in Warrendale consists of 56 employees, 26 of whom were on layoff status at the time of the election. Pursuant to a Stipulation for Certification

---

1. The Decision and Order of the Board on the unfair labor practice charge are reported, *Silverman's Men's Wear, Inc.*, 250 N.L.R.B. 1388 (1980), but the Board's one-page Decision and Certification of Representative, *Silverman's Men's Wear, Inc.*, No. 6–RC–8448 (NLRB Feb. 20, 1980), are not.

2. This issue is properly before us because a valid certification is a prerequisite to the existence of a duty to bargain with an elected union. *Pittsburgh Plate Glass Co. v. NLRB*, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); *Vitek Elecs., Inc. v. NLRB*, 653 F.2d 785, 787–788 (3d Cir. 1981).

upon Consent Election, members of the unit voted by secret ballot on May 31, 1979, following approximately two months of campaigning. The Union won, 29 to 23, with two challenged ballots. The employer filed objections to the election, alleging that the Union's conduct in the waning days of the campaign had substantially disrupted the atmosphere of free and fair choice in which elections should be held. Although the Company originally filed five objections, only three have been preserved for our review.

First, the Employer claimed that the Union's Secretary-Treasurer, Robert Baird, significantly misrepresented to approximately 20 employees present at a meeting on May 25, 1979, the wage scales the Union had negotiated for its members at neighboring warehouse and distribution facilities. Second, the Company charged that at the same meeting Baird had infected the election atmosphere with religious prejudice and intolerance when he referred to Mark Silverman, a Company vice-president, as a "stingy Jew." Finally, the Employer alleged that Baird and other Union officials had engaged in unlawful electioneering on the day of election.

The Company proffered witnesses in support of its allegations. The Regional Director interviewed these witnesses and, finding the objections to have raised no "substantial and material factual issues," declined to hold a hearing. 29 C.F.R. § 102.69(d) (1980). On the basis of his investigation, he recommended that the Board overrule the objections and certify the results of the election. The Board adopted that recommendation.

After the election was certified, the Union demanded that the Company bargain collectively with it concerning the terms and conditions of employment at the Warrendale facility. The Company refused and an unfair labor practice charge was filed. The Board entered summary judgment for the Union, concluding that all of the Company's claims had been fully litigated and resolved during the representation proceedings. 250 N.L.R.B. 1388 (1980). This application for enforcement followed.

## II.

In order to obtain a hearing on its objections to conduct affecting the outcome of a Board-conducted representation election,

> the objector's proffer of evidence must prima facie warrant setting aside the election. The proffer may not be conclusory or vague; it must point to specific events and specific people. On the other hand, an evidentiary hearing is not required when, if all the evidence proffered by the objecting party is accepted as true, no ground is produced which would warrant setting aside the election.

*Anchor Inns, Inc. v. NLRB,* 644 F.2d 292, 296 (3d Cir. 1981). "[C]ourts will insist on an evidentiary hearing when a party's objection raises substantial and material issues of fact." *Id.* (citing *NLRB v. Campbell Products Department,* 623 F.2d 876, 879 (3d Cir. 1980)). In the instant case, the Regional Director accepted, in support of the Company's objections, statements he obtained during interviews with proffered employees who allegedly witnessed the Union misconduct. As a court we must decide whether this proffered evidence raised substantial and material factual issues, so as to require a hearing. *Vitek Electronics, Inc. v. NLRB,* 653 F.2d 785, 790 (3d Cir. 1981); *NLRB v. Sun Drug Co.,* 359 F.2d 408, 415 (3d Cir. 1966).

With respect to the first objection, alleging material misrepresentations of fact, the Regional Director compared the statements of the Company's "witnesses" with the allegations contained in the objection and concluded that the statements did not support the allegations. As to the second and third objections, unlawful appeals to religious prejudice and Union electioneering at the polls, the Regional Director, assuming the truth of both the statements of the Company-proffered employees and the allegations contained in the objections, concluded that they provided no basis in law for overturning the election.

We have no trouble agreeing with the Regional Director's disposition of the

first and third objections. As to the first, the only evidence, as opposed to allegation,[3] indicates merely that the union representative, in explaining the union dues structure, stated that those few union members receiving high rates of pay, $12 to $17 per hour, did not have to pay the normal monthly dues of twice the hourly rate, but instead were charged a reduced amount. Moreover, the statement was made six days prior to the election, giving the Employer ample time to respond.[4]

The Board has held that an election will be set aside "only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply...." *Hollywood Ceramics Co.*, 140 N.L.R.B. 221, 224 (1962); *see also General Knit of California, Inc.*, 239 N.L.R.B. 619 (1978). Given the evidence proffered, we do not believe the Regional Director erred in concluding that as a matter of law there was no substantial departure from the truth at a time which prevented the Company from making an effective reply. Because this evidence could not satisfy the *Hollywood Ceramics* test, no ground was produced which would warrant setting aside the election on the first objection, and therefore no hearing was required on that objection. *Anchor Inns, Inc. v. NLRB*, 644 F.2d at 296.

The Company relies principally on *Michem, Inc.*, 170 N.L.R.B. 362 (1968), to support its third objection alleging unlawful electioneering. In *Michem* the Board over-turned an election in which a union officer stood beside the line of employees waiting to vote, engaging them in conversation. The Board established a rule against "prolonged conversation between the representatives of any party to the election and voters waiting to cast ballots," based on the premise that "[t]he final minutes before an employee casts his vote should be his own, as free from interference as possible." *Id.* The rule, however, has limitations. First, it applies to "conversations between a party and voters *while the latter are in a polling area awaiting [sic] to vote.*" *Id.* at 363 (emphasis added). *Accord, Harold W. Moore*, 173 N.L.R.B. 1258 (1968) (rule applies only to conversations with voters "in the polling area or in line waiting to vote"). Second, the rule "does not mean that any chance, isolated, innocuous comment or inquiry by an employer or union official to a voter will necessarily void the election. We will be guided by the maxim that 'the law does not concern itself with trifles.'" 170 N.L.R.B. at 363.

■ The incidents which the Employer alleges constituted unlawful electioneering do not fall within the *Michem* prohibition. The Company charges first that Baird and another union representative campaigned among employees waiting for the commencement of the election, but the alleged campaigning took place in the warehouse cafeteria prior to the voting, not the recreation room where the polls were located. Because the campaigning was not directed to voters in the polling area, this alleged

---

**3.** The Company alleged that Baird stated that the Union had obtained hourly rates of pay of $12 to $17 for workers at two nearby distribution centers. Such a statement, if made, would be untrue, for workers at those centers make considerably less. None of the employees interviewed, however, including those proffered by the Company, remembered such an explicit statement by Baird. Rather, all the employees remembering the mention of wages at $12 to $17 hourly rates stated the figures came up only in discussion of union dues computations. It is not contended that there are no union members making those amounts.

**4.** The Employer asserts that it did not receive notice of the alleged wage misrepresentation until the morning of May 29. The election began at 3:30 p.m. on May 31. Thus, even though the Board would not allow the Employer to make election speeches on company time during the 24 hours before the election, *Peerless Plywood Co.*, 107 N.L.R.B. 427, 429 (1953), it had all of May 29 and much of May 30 to address employees at work to correct any misrepresentation. Further, although half the workforce was on layoff, the Company could reach those employees by telephone and in fact did talk to eight or nine by that method. Yet the Company never presented any clarification of the alleged wage error, either to the employees at work or to those reached while on layoff.

incident does not violate *Michem*. The second charge is that "a minute or two before the polls were to open, two union adherents burst into the polling place exclaiming 'we are going to be observers in the election, Mr. Baird, is that okay?'" This is precisely the "chance, isolated, innocuous comment" *Michem* excepts from its rule against conversations. There is no indication here of last minute campaigning. The third incident alleged by the Company is that a union adherent stood near the line of workers waiting to vote, "staring" at them and telling them when it was their turn to vote. The only evidence of conversation by this "staring" employee was the exchange of pleasantries. Although, as *Michem* counsels, parties to elections might be wise to refrain entirely from conversing with prospective voters, *id.*, we conclude that this third incident also was a trifle not reached by the *Michem* rule.[5] In sum, we agree with the Regional Director that the evidence proffered in support of the third objection would not under *Michem* warrant setting aside the election, and so no hearing was required on this objection either. *Anchor Inns, Inc. v. NLRB*, 644 F.2d at 296.

### III.

■ We cannot accept, however, the Regional Director's conclusion that no hearing is necessary on the second objection. The Company alleged that at the May 25, 1979, meeting attended by approximately 20 employees Union Secretary-Treasurer Robert Baird called Company Vice-President Mark Silverman a "stingy Jew." The Regional Director assumed the truth of this allegation, but concluded that "it does not afford a sufficient basis for setting aside an election." For that reason the Regional Director refused to hold a hearing on the objection. The refusal was improper.

In *Sewell Manufacturing Co.*, 138 N.L.R.B. 66 (1962), the Board set aside an election which the union had lost 985–331 because the employer appealed to anti-black racial prejudice in its campaign literature.[6] The employer had sent to employees a number of photographs and newspaper clippings purporting to demonstrate the friendliness of union leaders to blacks and the support the union had given to several civil rights groups. By such a linkage, the employer could exploit any anti-black animus and convert it to anti-union sentiment to defeat the organizational effort. The Board in *Sewell* took a position by which it clearly sought to prevent such tactics. "The Board does not intend to tolerate as 'electoral propaganda' appeals or arguments which can have no purpose except to influence the racial feelings of voters in the election." *Id.* at 71. This view is reflected in the test announced by the Board in *Sewell*:

> So long ... as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him.

*Id.* at 71–72 (emphasis in original) (footnote omitted). This rule was intended to be consistent with and in furtherance of the Board's function

> to conduct elections in which the employees have the opportunity to cast their ballots for or against a labor organization

---

5. The Company did not allege in the Board proceeding that the employee was a union agent. In concluding that this incident could not as a matter of law violate *Michem*, we find it unnecessary, as the Board also did, to determine whether the adherent, as a member of the Union's in-plant organizing committee, was a union agent. *See generally Season-All Indus., Inc. v. NLRB*, 654 F.2d 932 (3d Cir. 1981).

6. A second election, which the union lost 931–345, was subsequently set aside because the employer continued the improper campaign tactics. *Sewell Mfg. Co.*, 140 N.L.R.B. 220 (1962).

in an atmosphere conducive to the sober and informed exercise of the franchise, free not only from interference, restraint, or coercion violative of the Act, but also from other elements which prevent or impede a reasoned choice.

*Id.* at 70.

The Board contends that the evidence proffered here was insufficient under *Sewell* to warrant setting aside this election. We disagree. The general rule to be derived from *Sewell*, and the one that we apply, is that an effective appeal to racial or religious prejudice prima facie warrants setting aside an election. The facts of this case disclose an utterance that falls well within the proscription of that general rule. In making a remark such as the one involved here, a party does not simply set forth another party's position on matters of racial interest. Indeed, the remark, rather than identifying any position of the Employer, can typically serve only to spotlight the minority religion of the Company's principal. Such a remark has no purpose except blatantly to exploit religious prejudices of the voters. It deliberately injects "an element which is destructive of the very purpose of an election." *Id.* at 71. There is no question of truth or falsity in a slur such as this. We can see no reason for the remark except to inflame and incite religious or racial tensions. Thus, the Company has alleged a remark that falls within the *Sewell* definition and, under the rule of that case, the burden of establishing the legitimacy of the remark shifted to the Union. Without a hearing, however, the Union was

never required to meet that burden; furthermore, it was a burden that the Union clearly could not have met.[7]

On the other hand, it is not clear whether the Union could have met the separate burden of proving that Baird's remark, although nothing but a slur, was nevertheless harmless. However, in concluding that the objection was meritless prior to an evidentiary hearing, the Regional Director effectively deprived the Company of its right to a considered determination on that issue. *Cf. NLRB v. Staiman Brothers*, 466 F.2d 564, 567 (3d Cir. 1972). In his report certifying the election results, the Regional Director explained that Baird's remark was, in his view, "[a] single, casual reference to a party's religious or ethnic background in a campaign otherwise free of racial hostility." In the Regional Director's view, *Sewell*, as modified by *Paula Shoe Co.*, 121 N.L.R.B. 673 (1958), stands for the proposition that "*only* a deliberate and sustained appeal to racial prejudice which seeks to overstress and exacerbate racial feelings by irrelevant, inflammatory [*sic*] appeals affords a sufficient basis for setting aside a Board election." (Emphasis added.) The Board, pursuing this line of reasoning, argues that the incident was isolated, and therefore did not require a hearing. We cannot add our voice to this chorus. As a matter of *stare decisis*, it misstates *Sewell*. As a matter of policy, it is similarly flawed. The remark may not have been repeated, but because of its sensitive nature we hold that the Regional Director could determine the extent of its probable impact on the election only after a hearing.[8]

---

7. In a post hoc effort to rationalize the Regional Director's report on a ground not mentioned in that report, the Board in its brief and at argument on this appeal contended that the slur was "marginally germane." Apparently the Board's counsel was attempting to justify Baird's remark for purposes of meeting the second part of the *Sewell* test. However, we can reject that effort on grounds, *inter alia*, of its own lack of merit. If the Union leader had desired to stress the executive's parsimony, he could have referred to "stingy Silverman" or the "stingy vice-president." Instead, he allegedly resorted to a disreputable stratagem of bigots. The man's religion was not germane to the proper purposes of this election effort.

8. We need not now speculate whether there could ever be a blatant ethnic slur, having no other purpose or possible effect than to invoke irrelevant prejudices, that could properly be treated by the Board as if it had never occurred. For it may be possible that there could be a set of circumstances in which such a remark might be said, even absent an evidentiary hearing, to have had absolutely no effect on the outcome of the election. However, this was not a case in which the slur was so obviously devoid of impact as to be rejected out of hand.

In *Paula Shoe Co.*, the Board, without a prior hearing, rejected an objection to an election based on the union's inclusion in a handbill of a slur similar in character to the one now before us. Frankly, we find such a conclusion, reached without benefit of a hearing to determine the circumstances and likely impact of such a statement, to be inconsistent with the Board's professed position that "it does not condone appeals to prejudice," 121 N.L.R.B. at 676, and we reject it as an anomaly.[9] We note further that *Paula Shoe*, the only case cited by the Board in which such a result was reached without benefit of a hearing, was decided before *Sewell*.

When it is recognized that *Sewell* stripped the earlier result in *Paula Shoe* of any possible rationale, it becomes clear that the existing cases do not insulate Baird's remarks, as a matter of law, from attack. To the contrary, they state a standard for legitimacy that the Union is clearly unable to meet.[10] Moreover, the allegations in the Company's objection raised a prima facie case that Baird's religious slur did impermissibly infringe on the employees' freedom of choice. Twenty employees were present when the slur was allegedly made. If three were influenced in their votes by this improper remark, the outcome of the 29–23 election could have been altered. In addition, the Employer was powerless to answer a remark of this type in the way that it could have answered the alleged misrepresentation of wages. To respond to such a racial remark would only draw attention to it and perhaps fuel any bigotry inflamed by the Union leader's appeal. Because the Union resorted to religious prejudice in a manner that may have affected a significant number of employees and that precluded an effective response by the offended party, a new election may be required.[11]

**9.** Apparently, other Regional Directors no longer follow *Paula Shoe*. In two recent cases Regional Directors have scheduled hearings to review what seem to us incidents potentially less damaging to free choice than that alleged here. In *American Enka Co.*, 231 N.L.R.B. 1335, 1342 (1977), a hearing was held on an objection alleging three black union adherents had told another black worker at her home that she had been promoted so she would become a "white folks' nigger." In *Coca-Cola Bottling Co. Consol.*, 232 N.L.R.B. 717, 717–18, 720 (1977), a hearing was held on the allegation that a supervisor told four black employees that the man who would be their shop steward if the union won did not like blacks. In the present case, on the other hand, the slur was allegedly stated in front of twenty employees and the election might have come out differently if only three votes were altered.

Although in neither *American Enka* nor *Coca-Cola* were the election results ultimately set aside on these grounds, the hearings served two important functions. First, they provided the essential facts on the alleged improper conduct and its impact. Second, they indicated clearly to parties to elections that the Board will back up with action, not just tongue clicking, its position that it does not condone appeals to racial prejudice.

**10.** *See* note 7 *supra*. In addition to *Paula Shoe*, the Board on this appeal cited several other cases purporting to support the proposition that this single remark was insufficient as a matter of law to warrant setting aside an election. Although those cases are undoubtedly viable in other factual contexts, they are inapposite here. For example, in *Peerless of America, Inc. v. NLRB*, 576 F.2d 119, 125 (7th Cir. 1978), the union had charged the employer with past discrimination against workers on the basis of sex and nationality. Such a charge, concerning a legitimate and germane issue of importance to workers, is wholly different in character from the bald, bigoted slur alleged in this case. Similarly, in *NLRB v. Bancroft Mfg. Co.*, 516 F.2d 436, 440–44 (5th Cir. 1975), *cert. denied*, 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976), the union appeals to black pride that were found not to violate either the *Sewell* or *Hollywood Ceramics* rules, were different in character than the directly abusive remark alleged here. Moreover, in *Bancroft* a hearing had been held to determine the specifics and impact of the allegedly offensive conduct.

**11.** We note that due to the presence of these circumstances, the probable impact of Baird's remark may well have been sufficient to warrant setting aside the election under the standard announced in *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962), and subsequently revived and reinstated in *General Knit of California, Inc.*, 239 N.L.R.B. 619 (1978). That the objectionable conduct was a racial slur, not a misrepresentation, does not make the *Hollywood Ceramics* rule inapplicable. Both can deprive employees of the "full and complete freedom of choice in selecting a bargaining representative," *Hollywood Ceramics Co.*, 140 N.L.R.B. at 223, and can destroy the "laborato-

We conclude that under the law announced in *Sewell*, the Company's allegations, if true, would warrant a new election, assuming that the totality of circumstances surrounding Baird's remarks evinced an atmosphere in which those remarks may reasonably be expected to have had a significant impact on the employees' free exercise of choice. These factors should properly be explored at a hearing, because they constitute substantial and material factual issues necessarily arising out of the allegations made in the Company's objection. *See Anchor Inns, Inc. v. NLRB*, 644 F.2d at 296. Having received the Company's allegations, it was only through a hearing that the Regional Director could determine that such circumstances were *not* present, for only through a hearing could the union have borne its burden of proving that the utterance was harmless. Such a course—followed already by at least some Regional Directors—is necessary if elections are to be kept free, as they should be, from appeals to racial or religious prejudice.

## IV.

On the alleged facts, we hold that a hearing was necessary to ascertain whether the remark alleged in the second objection was made, and, if made, the extent to which it infected the election. Accordingly, enforcement will be denied and the proceedings remanded to the Board for a hearing on this objection only.

ry in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.*, 77 N.L.R.B. 124, 127 (1948). The Board's General Counsel recognized the relevance of the rule by arguing in the Board's brief that the remark did not meet the *Hollywood Ceramics* standard.