PAUL KELLY, JR., Circuit Judge,
dissenting.
Given the small number of eligible voters, this was a close election. In absolute numbers, it was far closer than Sewell Mfg. Co., 138 NLRB 66, 1962 WL 16079 (1962), where a 654 vote difference dictated the outcome. Id. at 66. A shift of just nine votes, given that two apparently were challenged, would have altered the result. Five days before the election, the union organizers were obviously trying to incite the employees to vote for the union. What better way than to point out that the owners or managers of the company were of a different faith and that the money they contributed to their church instead rightfully belonged to the workers? It is common knowledge that members of the LDS Church tithe.[1] With all due respect to the *1280 majority, religious bigotry is blatant in this case. The court’s resolution, taking comfort in the apparent absence of overt abuse, vulgarity, or profanity in the union organizers’ diatribe, simply misses the forest for the trees.
The court states, as it must, that the references to the religion of Honeyville’s owners “were wholly inappropriate,” not to be condoned, and particularly troubling given the employee applause that followed these comments. Although the court’s holding is couched in deference, we need not defer to patently incorrect factual findings. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (“Congress has ... made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial.”). Ignoring the obvious, the ALJ and the NLRB held that the statements in question were not an attempt to inject religious issues into the campaign by appealing to religious prejudice against the company and its owners. That conclusion is simply transparent. The only purpose of such comments was to mobilize the employees against their employer by suggesting that the employer preferred the religious interests of its owners over the welfare of its employees. See NLRB v. Silverman’s Men’s Wear, Inc., 656 F.2d 53, 58 (3rd Cir.1981) (noting that, as was the case here, the “remark, rather than identifying any position of the Employer ... has no purpose except blatantly to exploit religious prejudices of the voters”). This more than adequately satisfies a prima facie case of inflammatory remarks sufficient to shift the burden to the union to prove the remarks were truthful and germane. Were there any doubt, one need only consider the balance of those remarks. Id. at 59 (“[T]he allegations in the Company’s objection raised a prima facie case that [the] religious slur did impermissibly infringe on the employees’ freedom of choice.”)
The union agents did not stop after slurring the Mormon church. The next target was real or imagined contributions to Mormon missionaries. Finally came the non-germane commentary on the ability of the stereotypical missionaries to speak “good Spanish,” yet another reason to distrust the owners.[2] In my view, this case cannot be meaningfully distinguished from Silver-man’s. There, the Third Circuit held that a union official’s referring to a company official as a “stingy Jew” required the union to meet the burden of establishing the legitimacy of the remark, an impossible burden. Id. at 58. Indeed, this court’s attempts to distinguish Silverman’s are not particularly availing. While it is true that Silverman’s remanded for a hearing and our review is for substantial evidence, the Third Circuit made it clear that calling a company official a “stingy Jew,” regardless of the labor policies of the company, could not be legitimate; the issue on remand was whether the union could prove that the remark was harmless. Silverman’s, 656 F.2d at 60.
This court also indicates that the Mormon discourse was an isolated incident, not the central theme of the union’s campaign. *1281 That rings hollow when one considers the nature of the ten “meetings” between the union and the employees. Although Mr. Stephenson testified that ten meetings occurred, III R. at 421, the culmination of the union’s campaign occurred at the April 7th formal meeting where all or virtually all of the drivers were present. Prior to that, all that occurred was a series of informal encounters between employee organizers and substantially less than all of the employees. These informal encounters are nowhere near the equivalent of the April 7th meeting or rally. As such, the court’s conclusion that these statements were only an isolated incident bears no merit. Further, it strains credulity to suggest, as the court has, that under the “totality of the circumstances” these comments were not inflammatory, particularly given the employees’ embracing the comments with applause. Id. at 39-40. The comments in this case came at a critical time in the organizing process, were reprehensible and had absolutely no proper purpose in the election. I dissent.

. The comments also disparaged the company, Honeyville, Inc., based upon its alleged *1280 charitable contributions which were deductible for federal income tax purposes. A corporation may deduct charitable contributions from taxable income, subject to a maximum of ten percent of such income. I.R.C. § 170(b)(2). No evidence in this record suggests that Honeyville made such contributions.

. Virtually all of the drivers spoke only Spanish. Ill R. Tr. at 36 (An employee, testifying through an interpreter, noted that "Mr. Raul ... was the Interpreter for everybody because [Mr. Stephenson] does not speak Spanish and we do not speak English.”).